UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
DANIEL YEBOAH-SEFAH,            )
                                )
        Petitioner,             )
                                )
v.                              )        Civil Action No. 04-10125-RWZ
                                )
EDWARD FICCO,                   )
                                )
        Respondent.             )
_____)

**RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE PETITION FOR HABEAS CORPUS**

Petitioner Daniel Yeboah-Sefah, known at the time of his conviction as Henry Boateng, is currently serving a life sentence of imprisonment after being convicted of the 1992 first degree murder of his five-week-old son. Petitioner does not contest that he beat Jameel Moore to death in the course of a protracted, violent assault on Jameel's mother. Instead, Petitioner contended at trial that the killing was excused by his mental condition, and contends in this petition that his mental condition–and particularly the effect it had on the performance of his trial counsel–rendered his trial unfair. These matters were thoroughly litigated in the state courts, which held extensive hearings and made specific findings rejecting the factual bases of the claims raised here. The state courts found that the attorney performance errors Petitioner complains of were reasonable tactical decisions in the presentation of his mental illness defense, and moreover, that the decisions Petitioner now insists counsel should have made would not have aided Petitioner's defense. This petition is largely an effort to have this court revisit those fact-bound determinations, a function that is inappropriate for a habeas court, particularly under the stringent standards of 28 U.S.C. § 2254.

The petition should be denied because Mr. Boateng has failed to demonstrate that the state courts' adjudication of his claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. The factual determinations that underlie the state court decision are, for present purposes, presumptively correct, and Petitioner has neither demonstrated that these determinations were objectively unreasonable in light of the state court record, nor proffered anything approaching the kind of clear and convincing evidence that would be required to overcome the presumption of correctness that attends these factual findings.

## I. Prior Proceedings

The facts underlying the conviction are set forth in the opinion of the Supreme Judicial Court ("S.J.C."). Supplemental Appendix at Tab E, pp. 6-7 [hereinafter "Supp. App. at ___:___]. In summary, in October 1992, Petitioner lived in Worcester with Alecia Moore and their five-week-old son Jameel. *Id*. at 6. On October 25, Moore told Boateng he would have to move out of the apartment, after which he strangled, hit and kicked her over the course of about two hours. *Id*. During this time, Petitioner took Jameel out of his crib, threw him on the floor and kicked and strangled him, kicking Moore in the face when she tried to stop him. *Id*. Jameel died from his injuries. *Id*. Petitioner was charged with first degree murder, armed assault with intent to murder, assault and battery with a dangerous weapon, and assault and battery. *Id*. at 6-7. Petitioner's defense was that he was not criminally responsible because he was suffering from severe psychiatric disease. *Id*. at 7. A Worcester County jury convicted Petitioner on all counts, and he was sentenced to life imprisonment. *Id*. at 6-7.

Petitioner then filed a motion for a new trial alleging that trial counsel was ineffective,

*inter alia*, in his presentation of his psychiatric defense. The trial court held an evidentiary hearing and concluded that trial counsel was not ineffective. Supp. App. at G:RA201-RA224.

Petitioner's appeals from the convictions and the denial of the new trial motion were consolidated before the S.J.C., where Petitioner presented eight categories of arguments for reversal of the convictions. *See* Appellant's Brief, Supp. App. at Tab B:9-125. The S.J.C. reversed the denial of the new trial motion with respect to Petitioner's conviction for assault with intent to murder, holding that the judge improperly instructed the jury on the concept of malice for purposes of this charge, but rejected Petitioner's challenges to the remaining convictions. Supp. App. at E:13. In addition, the Court conducted plenary review of the entire record of the case and concluded that Petitioner "was well represented by counsel, and that the case was fairly tried." *Id*. The Court thus refused to disturb the first degree murder conviction and, on January 21, 2003, affirmed the judgment of the trial court in all respects, other than the conviction for assault with intent to murder, which was reversed and remanded to the trial court. *See* Docket Sheets, Supp. App. at A:5.

Petitioner filed a petition for rehearing in the S.J.C. on February 4, 2003, and the Court denied the petition on March 7, 2003. Supp. App. at A:5. The instant petition and motion to stay were filed together on January 21, 2004.

After this Court stayed the petition on Petitioner's request, Petitioner filed a motion for new trial in the state Superior Court, 3d. Supp. App. at L:RA1-RA70, which the trial court denied without a hearing. Supp. App. at N:A1-a10. Petitioner sought leave to appeal from a Single Justice of the S.J.C., 3d. Supp. App. at L, who denied leave on May 5, 2006, finding that the issues raised by Petitioner were neither new nor substantial. 3d Supp. App. at P.

3

II.    **The Factual Findings**

The factual findings of the state courts are presumptively correct. 28 U.S.C. § 2254(e)(1). *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000). This presumption of correctness extends to inferences drawn by the state courts from those factual determinations, *Parke v. Raley*, 506 U.S. 20, 35 (1992), to any factual findings implicit in the state courts' ruling, *Weeks v. Snyder*, 219 F.3d 245, 258 (3d. Cir.), *cert. denied,* 531 U.S. 1003 (2000), and to facts found by both the appellate and trial courts. *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002). The presumptive correctness of state court factual determinations may only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The S.J.C. set the factual background for the case:

> Boateng and Alecia Moore (Moore) met in Worcester in June, 1991, and began to date. In January, 1992, Boateng briefly moved to Amherst to attend classes at the University of Massachusetts, but soon moved back to Worcester. At about the same time Moore told him that she was pregnant with his child. In the fall of 1992, Moore moved into an apartment and Boateng came to live with her soon thereafter. A week later, their son, Jameel, was born.

> As a condition of Boateng's moving in with Moore, she had required him to find a job or go back to school. He was unable to hold steady employment, however, and on both the night of October 24 and the morning of October 25, 1992, she told him that he would have to move out of the apartment.

> The discussion on October 25 occurred in Boateng's bedroom, which was down the hall from where Moore and five week old Jameel slept. As Moore left the room following the conversation, Boateng sprang up, threw Moore to the floor, and yelled, "I'm going to kill you!" as he strangled, hit, and kicked her. Although Moore's memory of the succeeding events was not precise, she testified that over the next two hours Boateng administered a long series of assaults on her, including some with a stick. At some point during this assault, Boateng stated that "I'm going to get the baby," and retrieved Jameel from his crib. He threw Jameel onto the floor and began to kick and

4

strangle Jameel, kicking Moore in the face when she tried to stop him.   He then took the baby and put it back in its crib.   Jameel died as the result of the injuries suffered in this assault.

Moore managed to crawl to her room and lie on the bed.   While she was still lying down, Boateng produced a knife and held it over Jameel in his crib. He then briefly did the same to Moore.   Eventually the telephone rang, and Boateng spoke with Moore's mother, who wanted to speak to Moore. Boateng told her that Moore was out doing laundry;  he then hung up and ripped the telephone cord out of the wall.   As Moore had just been to her house the day before to do laundry, her mother's suspicions were raised and she and her other daughter drove to Moore's apartment to investigate.   When no one answered at the door, she contacted the police.   She and her daughter also yelled for Moore from outside the house.   When Boateng heard them, he became disconsolate, went into the bathroom and drank from a container of bleach, saying that he would not go to jail.   He did manage, however, to prevent Moore from going downstairs to reach her mother and sister.

The police soon arrived.   Moore was taken to a hospital while a detective read Boateng the Miranda warnings and questioned him about what had happened.   Boateng responded that he and Moore had gotten into a fight.

At trial, Boateng's defense was based on insanity.    Boateng presented evidence to show that, periodically since 1988, he had been receiving treatment for a psychiatric disorder that had at different times been diagnosed as dysthymia, or mild depression;  major depression;  major depression with psychotic features and schizo-affective disorder;  that he had been prescribed and had taken antidepressant and antipsychotic drugs that had had varying effects on his mood and thought processes but that had often controlled his psychosis; and that the combination of medications and illness had prevented him from being able to maintain a job or receive a higher education.

Dr. David Rosemarin, a psychiatrist, was called as a defense witness.  He testified that on the day in question Boateng was likely in the grip of psychosis, feeling under the control of a spirit and hearing voices mocking him and telling him to kill himself.   Rosemarin related that Boateng had told him that after he assaulted Moore but before attacking Jameel, he had responded to these voices by mixing all of his antidepressant and antipsychotic medication and taking it in one dose.  While Rosemarin could come to no conclusion regarding Boateng's state of mind during his attack on Moore, it was his opinion that Boateng had suffered a hallucination causing him to believe that Jameel was some sort of evil creature or cat who would kill him if he did not kill it first.    It was Rosemarin's further opinion that Boateng was not criminally responsible within the meaning of

*Commonwealth v. McHoul*, 352 Mass. 544, 546, 226 N.E.2d 556 (1967).

The Commonwealth called as its expert Dr. Marc Whaley, who acknowledged that Boateng suffered from major depression with possible psychotic features and that antipsychotic drugs had helped him to function. Nevertheless, Whaley opined that Boateng's actions on October 25, 1992, displayed a rationality that belied any claim of actual insanity, and concluded that Boateng had sufficient mental capacity to be criminally responsible for his actions on that date.

The jury convicted Boateng of the murder of Jameel with extreme atrocity or cruelty. For the attack on Moore, they convicted him of armed assault with intent to murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and assault and battery. Boateng appealed and subsequently filed a motion for a new trial based on ineffective assistance of counsel. The appeal was stayed pending the outcome of the motion. The motion judge, who was not the trial judge, conducted an evidentiary hearing at which Boateng's new counsel called three new expert witnesses. Boateng claimed that these witnesses, if they had been called to testify at trial, would have presented a stronger case for insanity and that trial counsel's failure to call them was manifestly unreasonable, constituting ineffective assistance of counsel. Boateng's trial counsel also testified at the hearing and defended his trial tactics and strategy.

The motion judge concluded that trial counsel's conduct had not fallen below the standard of an ordinary fallible lawyer and denied Boateng's motion for a new trial. Boateng appealed from that denial, and we consolidated that appeal with his direct appeal.

Supp. App. at E:6-7.

The trial court also made detailed factual findings following the evidentiary

hearing:

Based upon the record and credible evidence presented at the several hearings upon the motion, the court finds as follows:

1. The evidence at the Rule 30 hearings was not persuasive that defendant was incompetent by reason of his mental condition, voluntarily to utter statements and to waive his *Miranda* rights.

2. The statements defendant uttered, both with and without *Miranda* compliance, rationally tended to support his determination, at trial, to pursue

6

the defense that he was not guilty by reason of insanity ("NGI").

3. [Trial counsel]'s election to present the NGI defense through expert witness Dr. Rosemarin, rather than Dr. Spiers, was grounded upon Dr. Rosemarin's more defense-supportive diagnoses, his abstention from reliance on the improbable evidence of hallucination, and his more extensive familiarity with defendant's mental circumstances. Additionally, Dr. Rosemarin had spent ten to twelve hours interviewing defendant on six to seven occasions while Dr. Spier's observation of defendant was limited to one to two hours on a single occasion. Dr. Spiers, who characterized defendant's mental condition as "possible" and "probable", did not conduct an *in personam* examination of defendant in connection with the question of the voluntariness of defendant's statements. Dr. Spiers' interview with defendant relative to the NGI defense was *de minimis* in duration, and he relied, in large measure, uon defendant's self reporting.

4. [Trial counsel] believe that Dr. Spiers' testimony might contradict the opinions of Dr. Rosemarin, thus undermining the defense of NGI. [Counsel] thus eschewed Dr. Spiers (and his psychological/neurological conclusions) as a trial witness and the defense's lot with Dr. Rosemarin and his psychiatric/behavioral diagnoses.

5. [Trial counsel] was very experienced at criminal defense work and had handled approximately twenty murder cases. He was listed on the "murder-qualified" list of the Committee for Public Counsel Services. He was appointed to represent defendant after two prior counsel had been permitted to disappear. [Counsel] met with defendant at the Worcester County House of Correction, spoke with defendant by phone several times each week, accepted frequent collect calls from defendant, received discovery from predecessor counsel and the prosecutor, and delivered copies thereof to defendant. He spoke with defendant's predecessor counsel concerning defendant's desire for an NGI defense, obtained records pertinent to defendant's mental condition, spoke to medical professionals knowledgeable as to defendant's state of mind and learned that defendant did not contest the Commonwealth's version of the circumstances of the victim's death.

6. [Trial counsel] determined that the evidence of defendant's admissions was not harmful to, and, indeed supported the defense theory of NGI. Accordingly, he did not seek to suppress that evidence or otherwise exclude it from evidence. So too, his determination not to call upon medical professionals to challenge the voluntariness of defendant's admissions was founded upon his view that, were he to succeed in suppressing or diminishing the effect of the admissions, he would most probably only accomplish only an erosion of his NGI defense. He wanted some of the statements, such as

the threats against Alicia, to come into evidence to bolster the NGI defense; he did not want to reveal certain information about defendant's mental state in advance of trial; and, in any event, he believed that a challenge to voluntariness was, on the facts, unlikely to succeed.  In sum, counsel resolved, as a tactical choice, to support the NGI theory with defendant's admissions and insanity-evocative conduct.

7. [Trial counsel] discussed with defendant in advance of trial, all the tactical options available in pursuit of the NGI strategy, and defendant assented to the approaches suggested by counsel.  There is no evidence that defendant's acquiescence in these decisions was uninformed, involuntary or compelled by a disabling mental state.

8. [Trial counsel] had two long conversations with defendant regarding the potential conflict raised by [counsel's] past and pending representation in civil matters of the Commonwealth's pathologist.  Upon inquiry, the court determined that defendant understood that the dual representation might create a potential conflict of interest, to wit that [counsel] might be required, by his duty to defendant, to make an uncomfortably forceful with his *outre* client, Dr. Kessler; or that something could happen during Dr. Kessler's testimony to make Dr. Kessler's position "somewhat antagonistic" to defendant.  Defendant was aware of such risks when he decided to have [counsel] continue to represent him despite the potential conflict of interest.  Parenthetically, this conflict did not metamorphose, during trial, into an actual conflict.

9. [Trial counsel] used the viciousness of defendant's attack on the baby as a make-weight defense strategy of lack of criminal responsibility.

10. At defense counsel's request, the tria judge conducted an evidentiary hearing on defendant's competency to stand trial and his election to take medication during the trial.  At the hearing, several mental health professionals who had treated and prescribed medications for the defendant over extended periods of time testified that defendant was capable of deciding whether to take medication during trial.  Upon inquiry, defendant expressed his intention to take hismedication during trial, suggesting that, otherwise, the trial would not go well.  Defendant told the trial judge that "if I don't take my medication, there may not be a trial."

11. [Trial counsel] made a strategic decision not to introduce the defendant's medical records at trial because most of the records were duplicative of testimony presented at trial by the expert witnesses and because [counsel] believed that portions of the records contained materials that might have detracted from defendant's insanity claim.

Supp. App. at G:RA201-RA208.

### III.   The State Court Decision Was Neither Contrary to nor an Unreasonable Application of Clearly Established Federal Law, as Determined by the United States Supreme Court.

The instant petition raises four grounds for relief. Ground 1 argues that the defendant's waiver of counsel's purported conflict in representing a prosecution witness in an unrelated civil matter rendered him ineffective assistance; Ground 2 is that Petitioner was denied effective assistance of counsel in several respects; Ground 3 claims that the trial court erred in holding a competency hearing one week before trial, rather than the day trial began; Ground 4 concludes that the Supreme Judicial Court violated Petitioner's constitutional rights when it failed to reverse the conviction because the trial court had not *sua sponte* held a voluntariness hearing with respect to certain statements made by Petitioner.

#### A.   Standard of Review

Habeas corpus review of claims previously adjudicated by state courts is both limited and highly deferential:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which vests "primary

responsibility" for evaluating federal law claims raised in criminal trial in the state courts, courts which must be presumed in habeas corpus courts to know and follow the law. *Woodford v. Visciotti,* 537 U.S. 19, 26-27 (2002) (per curiam). Thus, as the Supreme Court has repeatedly emphasized, it is not sufficient to warrant habeas corpus relief that the state court's decision was erroneous or incorrect. *Id.* at 27; *Williams v. Taylor*, 529 U.S. 362, 412 (2000). It is not even sufficient that the state court "failed to apply" Federal law clearly established by the Supreme Court, *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam), or that the state court committed "clear error," or that the reviewing court is of the "firm conviction" that the state court's ruling was erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

Rather, federal courts must decline to intervene to disturb state court judgments unless Petitioner demonstrates that her claim falls into one of the narrowly drawn categories set forth in the statute. "Under § 2254(d)(1), the writ may only issue if one of. . .two conditions is met. . ." *Williams*, 529 U.S. at 412. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently from [the Supreme] Court on a set of materially indistinguishable facts." *Id.* at 412-13. The analysis under the "unreasonable application" clause is distinct, and relief is available only if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. To be entitled to relief under the latter clause, the burden is on Petitioner to show that the state court decision applied the clearly established law in an "objectively unreasonable manner." *Id.* at 409-410. Since, "[a]pplying a general standard to

a specific case can demand a substantial element of judgment," "[t]he more general rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvorado*, 541 U.S. 652, 124 S.Ct. 2140, 2149 (2004). The clearly established law that is relevant to the analysis under § 2254(d)(1) is limited to the holdings of United States Supreme Court cases extant at the time of the state court decision, and does not include the dicta of such cases. *Id.* at 2147; *Williams*, 529 U.S. at 412.

Factual determinations of state courts are granted similar deference.  To satisfy § 2254(d)(2), a petitioner must show that the state's factual determination was objectively unreasonable.  *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)).   Objective unreasonableness is not merely an incorrect or erroneous decision.  *Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error.  Instead, he must further establish that the state court committed unreasonable error."); *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003) ("federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination").

Moreover, § 2254(d)(2) must be interpreted in conjunction with § 2254(e)(1), which specifies both that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Sanna v. DiPaolo*, 265 F.3d 1, 7. *See also Miller-El,* 537 U.S. at 341 (noting that to prevail under § 2254(d)(2), habeas

petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the court's factual determination was objectively unreasonable).

Surpassing even the substantial deference habeas courts pay state court determinations of federal questions, is that accorded decisions regarding state law, which are completely unreviewable in habeas corpus, as the Supreme Court has repeatedly held:

> We have stated many times that federal habeas corpus relief does not lie for errors of state law.  Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

### B.  The State Court Decision that Petitioner Voluntarily Waived Counsel's Potential Conflict of Interest Did Not Result From an Unreasonable Determination of the Facts in Light of the Evidence Presented in the State Court Proceedings.

Petitioner claims that the in-court waiver of counsel's potential conflict of interest arising from representation of the state pathologist in an unrelated civil case was ineffective, and that the state court decision rejecting this claim resulted from an unreasonable determination of the facts in light of the evidence presented in the state court.

Trial counsel brought this matter to the court's attention before trial:

> [Defense Counsel]: In addition, there is one more matter.  I thought I had put it in writing .  I discussed it both with my client and with Mr. Landry.  It involves a matter of a potential conflict of interest.  I just wish to put it on the record at this time and have the court make an inquiry of Mr. Boateng and Mr. Landry.
>
> The medical examiner in this case or the forensic person who did the forensic autopsy is Doctor Stan Kessler.  Doctor Kessler is a client of mine

12

in a civil case. This situation in this case is based on a psychiatric defense.

I have gone through the autopsy report, and there is no serious or substantial challenge to the facts, and circumstances and the conclusions of the medical examiner. In fact, we may use the medical examiner to bring out certain aspects of the autopsy which we think are favorable to the defendant in light of all the evidence and the conclusions that are going to be reached during the course of the case.

I have spoken directly to Doctor Kesssler. He has no difficulty with it. Mr. Landry has indicated no difficulty with it. I have explained it at length on two different occasions to Mr. Boateng. In view of the nature of this case, he has no objection to it. I simply wish the court to make inquiry of it now, your honor, so there are no difficulties later on.

THE COURT: Yes. Mr. Boateng, we are talking about Doctor Kessler and the fact that your lawyer represents him a civil matter. Now he says that he talked to you about that a couple of times.

Defendant Boateng: Yes, your honor.

The Court: And that from the nature of this case, in the way in which this case is going to be tried, that his understanding of your position is the fact that he is representing him in this civil matter, and that that represents, in a technical sense, a conflict of interest, that your position is that you have no objection to his representing you and having to question Doctor Kessler in your behalf, and the like, all of those questions that surround that subject. Is that so?

Defendant Boateng: Yes, your honor.

The Court: All right. Thank you.

[. . . .]

The Court: I would just say this to you: – you can stay where you are Mr. Boateng – that you are always a little bit concerned about situations where there is a conflict of interest, because you can't always reach out and deal with situations when you don't anticipate them, when they happen in the course of a trial. Sometimes, for example, a witness says something which you didn't know about ahead of time, and it's necessary for the lawyer to take a rather forceful position with the witness, for example, really cross-examine that witness.

So that when you deal with the situation in advance, like we are here, and you say that you are agreeable to this lawyer, under these circumstances acting as your lawyer, you have to accept with the fact that it's conceivable something could happen while Kessler was testifying that made his position, Kessler, and your position, somewhat antagonistic. Do you understand that?

Defendant Boateng: Yes, your honor.

The Court: And are you agreeable to that?

Defendant Boateng: Yes, your honor.

The Court: Nevertheless, right?

Defendant Boateng: Yes, your honor.

Tr. 1:36-38.

When, after conviction, defendant claimed that this waiver was involuntary, the trial court rejected this contention, concluding that "defendant made a knowing and voluntary decision to have [defense counsel] represent him despite and conflict created by the dual representation." Supp. App. at G:RA210.

The SJC affirmed:

Before trial, defense counsel informed the judge hat he represented a prosecution witness, the medical examiner, in an unrelated civil case to which the medical examiner was a party. He stated that he had discussed the matter with the medical examiner, the prosecutor, and Boateng and that all believed that his representation in the civil case did not create a conflict of interest. Boateng now contends, however, both that the judge failed to conduct a proper colloquy with him to ensure his knowledge of and voluntary assent to the dual representation, and that trial counsel's dual representation in fact prejudiced him because it caused counsel to refrain from aggressive cross-examination of the medical examiner and from calling a rebuttal witness who could have provided a different opinion regarding the cause of death, an opinion more favorable to Boateng. The judge who ruled on Boateng's motion for a new trial rejected both of these claims, and we do as well.

On learning of the dual representation, the trial judge conducted an inquiry

14

of Boateng to determine whether his decision to continue with his trial counsel was intelligently made.  The judge asked Boateng several questions in regard to the potential conflict,  and received assurances that he found to be informed and adequate.  While the colloquy, which is largely set forth in the margin, did not elicit the type of narrative responses from Boateng for which we expressed a preference in *Commonwealth v. Goldman*, 395 Mass. 495, 507-508, 480 N.E.2d 1023, *cert. denied*, 474 U.S. 906, 106 S.Ct. 236, 88 L.Ed.2d 237 (1985), and was less extensive than the model we approved in *Commonwealth v. Jones*, 403 Mass. 279, 281-284 n. 2, 526 N.E.2d 1288 (1988), this does not mean that it was inadequate.  We are satisfied that any deficiency in the colloquy as it appears in the transcript was due less to the diligence of the judge in ensuring that the decision was knowing and voluntary than to the reticence of the defendant.  Boateng knowingly and voluntarily assented to the dual representation.

Supp. App. at E:9-10.

Petitioner suggests, Pet. Mem. at 34, that this decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  To the contrary, nothing in the record before the trial court or the S.J.C. showed that Petitioner's waiver was involuntary, much less that a contrary determination was "objectively unreasonable."  The facts before the trial court and the S.J.C., which Petitioner does not challenge (much less contradict with clear and convincing evidence), were:  that counsel had spoken with Petitioner "at length on two different occasions" about this matter; that there was nothing in the anticipated testimony of Kessler–given that Petitioner's defense strategy was to admit the killing–particularly harmful to the defense, and indeed, that some of Kessler's testimony might well support the insanity defense; and that the court advised defendant about the possible dangers of dual representation; and that Petitioner had repeatedly assured the court that he assented to continued representation by defense counsel, notwithstanding the potential conflict. Against this, Petitioner offers the record evidence of Petitioner's mental illness and

15

treatment therefore.  But, as the trial judge and the S.J.C. knew, Petitioner had been found

competent to stand trial just five days before the conflict colloquy, at a hearing where the

psychiatric testimony as to Petitioner's decision-making abilities was clear and one-sided:

> [Dr. Simmons]: I met with Mr. Boateng this afternoon with his lawyer
> present, for the purpose of an evaluation relative to his competency to stand
> trial. . . .
>
> I should mention as well, your honor, that I did the initial 15A
> evaluation of Mr. Boateng in the District Court just subsequent to his arrest
> on these charges.  So I have some history with him.
>
> Mr. Boateng presented as somewhat lethargic, his affect was
> somewhat flattened.  However, he appeared very well able to converse in a
> logical and coherent manner.  He seemed to understand the initial warning
> that I gave him about the lack of confidentiality of our meeting.  He was able
> to repeat that back to me accurately, as well as an understanding of the
> general content of what we would be discussing.
>
> He appeared to understand the general court process.  He was able to
> give an accurate and fairly – and a good description of the role of his lawyer,
> of the prosecutor, of yourself and the jury.  He seemed to understand the
> adversarial nature of court proceedings.  He was able to understand his role
> in those proceedings and seemed very well able to consult with his attorney
> in the service of his defense.  he demonstrated an ability to do that during the
> session.
>
> And both from his report and his attorney's report, it appears that they
> have been able to discuss his case without difficulty in terms of discussing
> various options available to him for defenses . . . .
>
> So he appeared to understand court proceedings, his role in those
> proceedings.  That did not seem to be interfered with at at all, given his
> somewhat dulled state from the medication.

Tr. XV:31-33.  In short, all of the evidence in the record before the state courts tended to

support their conclusion that Petitioner's waiver of any potential conflict of counsel

regarding Doctor Kessler was intelligently and voluntarily made.  Nothing in the record

before the state court was so contrary to this conclusion as to render the factual

determination on this matter objectively unreasonable.

Moreover, as will be discussed further, *infra,* the conflict here was not, even if it

16

had not been waived, one which denied Petitioner the effective assistance of counsel.

Because the state court decision denying this claim was not based upon an objectively

unreasonable determination of the facts in light of the record before the state courts, and

because the conflict was not one entitling Petitioner to relief in any case, this court should

deny relief on Ground 1 of the petition.

> **C. The State Court Decision that Petitioner Did Not Receive Ineffective Assistance of Counsel Was Neither Contrary to Nor an Unreasonable Application of Clearly Established Federal Law.**

In Ground 2, Petitioner contends that trial counsel was ineffective in six respects.

However, he fails to demonstrate that the state courts either contradicted or unreasonably

applied *Strickland* or any other clearly established federal law in rejecting these claims.

### 1. Defense Counsel Did Not Actively Represent Competing Interests.

Petitioner contends that, because his waiver was inadequate, the representation of

conflicting interests denied him the effective assistance of counsel. Even if Petitioner had

not waived the potential conflict, *supra*, it was not one that deprived him effective

assistance of counsel within the meaning of the Sixth Amendment.

The S.J.C. denied this claim on the merits:

> Boateng is similarly incorrect in his claim that the dual representation itself warrants a reversal of his convictions. The motion judge found that trial counsel's conflict of interest was only potential, not actual. We agree. While Boateng cites *Commonwealth v. Hodge*, 386 Mass. 165, 434 N.E.2d 1246 (1982), for the proposition that simultaneous representation always creates an actual conflict, the nature of the conflict in this case is significantly different from that in the Hodge case. In that case, the witness represented by defense counsel's firm was a key witness against the defendant on a "critical issue" in the case, providing testimony so contrary to the defendant's story that before the witness was cross-examined the defendant gave evidence to his attorney showing that the witness was wrong and asked the attorney to present the evidence to the court, which the attorney refused to do. *Id*. at

17

166-167, 434 N.E.2d 1246. While Boateng asserts that similar circumstances are present here, and that trial counsel's representation of the medical examiner prevented him from presenting important evidence on Boateng's behalf, we disagree that the circumstances are similar and that the evidence to which Boateng now points would have assisted him.

In essence, Boateng now asserts that the killing of Jameel could not have been extremely atrocious or cruel because there is evidence to suggest that Jameel died as a result of the first blow administered by his throwing Jameel to the floor. At the evidentiary hearing on the motion for a new trial, Boateng called an expert who adopted that theory, claiming that the first blow struck Jameel's head against the floor, killing him. Boateng claims that trial counsel should have presented this evidence and argued that when a single blow causes death the killing cannot be considered extremely atrocious or cruel as a matter of law. That argument, however, would have stood in direct conflict with the law as elaborated in *Commonwealth v. Golston*, 373 Mass. 249, 260, 366 N.E.2d 744 (1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978) ("A murder may be committed with extreme atrocity or cruelty even though death results from a single blow"). *See Commonwealth v. O'Brien*, 432 Mass. 578, 591, 736 N.E.2d 841 (2000) (judge's "instruction that death caused by a single blow could, in some circumstances, as when directed against an infant, support a finding of extreme atrocity or cruelty, was correct").

Moreover, in determining whether the murder was committed with extreme atrocity or cruelty, the jury must consider the *Cunneen* factors, including, among others, the defendant's indifference to the victim's suffering; the extent of the injuries; the manner and force with which the wounds occurred; and the disproportion between the force used by the defendant and the means necessary to cause death. *See Commonwealth v. Cunneen*, 389 Mass. 216, 227, 449 N.E.2d 658 (1983). Although the jury must find at least one of these factors to support their verdict, there is no one factor that is an essential element of extreme atrocity or cruelty, and the jurors do not have to be unanimous as to which factor is found. *Commonwealth v. Hunter*, 427 Mass. 651, 657-658, 695 N.E.2d 653 (1998). The jury heard evidence that Boateng beat a five-week old baby so severely that he crushed his skull, broke several of his ribs, and seriously damaged his lungs. Thus, even if death resulted from the first blow, the jury had ample evidence from which to conclude that one or more of the *Cunneen* factors were present and that the case presented an occasion of "savage, unfeeling, [and] long-continued brutality." *Commonwealth v. Cunneen, supra* at 228, 449 N.E.2d 658. Boateng was not prejudiced by his trial counsel's failure to present an alternative "single blow" theory to rebut the conclusions of the medical examiner.

Finally, the medical examiner's testimony regarding cause of death was peripheral to Boateng's defense of insanity, and indeed, as trial counsel testified at the hearing on the motion for a new trial, there were many aspects of the medical examiner's testimony, presumably including the ghastliness of the killing, that supported the defense theory of insanity.

There are other important differences between the situation addressed in *Commonwealth v. Hodge, supra*, and the case before us. For example, in the *Hodge* case, while there was evidence that defense counsel had notified the defendant that a law partner was representing a key prosecution witness against him in a civil matter, there was no evidence that defense counsel fully explained the implications of this representation to the defendant or that defense counsel informed the court of the potential conflict. Consequently, the judge was not even in a position to conduct his own inquiry. In light of these circumstances, the court reasoned that the defendant had not waived his right to a lawyer with undivided loyalties because he had not "understood and appreciated" the possible harm the conflict might cause him. *Id*. at 170, 434 N.E.2d 1246. In contrast, here the potential conflict was brought to the judge's attention in a timely fashion, and the judge conducted a colloquy with Boateng, specifically directing his attention to the possible negative implications of the dual representation. He concluded that Boateng's waiver of the potential conflict was knowing and intelligent. In these circumstances, Boateng was not deprived of any rights that he may have had.'

Supp. App. at E:9-11.

The S.J.C.'s decision was not contrary to federal law, which imposes a stricter standard for conflict claims than Massachusetts law does. In order to show a Sixth Amendment violation, Petitioner must demonstrate that the purported conflict "adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162 (2002). Here, as the S.J.C.'s extensive analysis shows, there was no such showing regarding the representation of Kessler by defense counsel. Petitioner essentially concedes as much, arguing essentially that the S.J.C. violated its own "actual conflict" rules in rejecting this claim. Pet. Mem. at 57. This is insufficient to permit habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Defense counsel actively represented no interest

19

competing with Petitioner's, and Petitioner made no convincing showing of an adverse effect on counsel's performance at trial. This is not a conflict of interest claim for which the Sixth Amendment provides relief.

**2. The State Court Decisions That Counsel's Strategic Choice Not to Challenge the Admissibility of Statements Tending to Support his Claim of Insanity Was not Ineffective was Not an Unreasonable Application of Federal Law.**

Petitioner claims that he received ineffective assistance of counsel by the failure to seek to suppress certain statements made to police and others on grounds of involuntariness. As discussed, *infra*, at § III.E., the S.J.C. rejected this claim on the merits, noting that no prejudice was suffered by defendant, since the statements at issue tended to support the insanity defense. Moreover, as the trial court found, this decision of trial counsel was a reasonable strategic choice, since the statements at issue tended to support the insanity defense presented here.

**3. The Decision not to Call Dr. Spiers Was a Reasonable Trial Strategy.**

Petitioner contends that the failure to call psychologist Dr. Spiers as a defense expert witness constituted ineffective assistance of counsel. This conclusion, however, is directly contrary to that of the trial court, which after conducting extensive evidentiary hearings, concluded that trial counsel reasonably refrained from calling Dr. Spiers, since his psychological testimony was less exculpatory, and tended to conflict with, the psychiatric testimony that Petitioner offered in support of his insanity defense. In light of these factual findings, the state courts' rejection of this ineffective assistance claim cannot be said to be objectively unreasonable.

**4.  The "Failure" to Elicit an Opinion that Petitioner's mental State Deprived Him of the Ability to Commit a Murder with Extreme Atorcity or Cruelty was Not Constitutionally Ineffective.**

This claim was, as Petitioner concedes, procedurally defaulted.  Moreover, as the S.J.C.'s discussion of the extreme atrocity or cruelty elements of murder under state law, *supra* at § III.C.1. makes clear, even if counsel had managed to elicit such an opinion, it would have been unlikely to have benefitted Petitioner, since, under state law, his conduct amounted to extreme atrocity or cruelty, regardless of the particular details of his mental state.

**5.  The Failure to Object to the Jury Instructions on the Voluntariness of Petitioner's Statements Was Not Ineffective Assistance.**

As described, *supra*, at § III.C.2., the decision not to seek to suppress Petitioner's statements on voluntariness grounds was a reasonable strategic decision, since those statements generally tended to support his insanity defense.  Because this is so, defense counsel's decision not to object to the jury instructions on this issue was neither a mark of incompetence, nor likely to have prejudiced Petitioner.

**6.  The Decision Not to Request a New Competency Hearing Five Days After the Previous One Was Not Ineffective Assistance of Counsel.**

As explained, *infra*, at § III.D, there was simply no basis to request a new competency hearing for Petitioner five days after a full hearing had been held, at which no opinion or evidence was offered that Petitioner was, in fact, incompetent to stand trial. Thus, there was neither deficient performance nor prejudice from defense counsel's failure to request a new competency hearing on the first day of trial.

Petitioner has made no showing of ineffective assistance of counsel, much less

that the the state courts contradiced or misapplied clearly established federal law in

rejecting these claims.  For these reasons, Ground 2 of the petition must be denied.

> ### D.  The SJC's Decision That Failure to **Sua Sponte** *Convene a Competency Hearing, Five Days After an Earlier Competency Hearing, Was  Not Erroneous Was Neither Contrary to Nor an Unreasonable Application of Federal Law Clearly Established by the Supreme Court.*

Although, as described, *supra*, the trial court held an extensive competency

hearing on February 24, 1994, at which the only testimony regarding defendant's

competence was that he was competent to stand trial, Petitioner contends that it was

erroneous for the trial court to fail, *sua sponte*, to conduct another competency hearing

five days later, on March 1, 1994, the first day of trial.  Pet. Mem. at 121-132.

The S.J.C. squarely rejected this contention:

> Boateng's first claim of error is that the judge should have conducted a
> competencychearing on the day the trial was to start to ensure that he was
> competent to stand trial.   Although a hearing had been conducted one
> week before trial, at which Boateng had been found competent, he claims
> that his long history of severe mental illness mandated a renewed hearing.
> While the judge is sometimes required to conduct a sua sponte inquiry into
> a defendant's competence, see Commonwealth v. Hill, 375 Mass. 50, 54,
> 375 N.E.2d 1168 (1978), that requirement arises only if there exists a
> "substantial question of possible doubt" as to that competence.  *Id.*,
> quoting *Rhay v. White*, 385 F.2d 883, 886 (9th Cir.1967).   On the first day
> of trial, trial counsel withdrew his previously filed motion for a
> competency hearing as moot, and informed the judge that nothing had
> occurred within the past week to warrant a new inquiry.  In these
> circumstances there was no substantial question that required the judge's
> *sua sponte* action.

Supp. App. at E:11.

Petitioner offers no support for his claim, Pet. Mem. at 131, n. 35,  that this

decision was contrary to clearly established Supreme Court law.  *Pate v. Robinson*, 383

U.S. 375, 385 (1966) holds only that the failure to hold any hearing at all as to competence (when evidence of incompetence is present) is improper.  Here, of course, a full competence hearing was held, where no evidence was presented suggesting that Petitioner was currently incompetent to stand trial.  The S.J.C.'s decision that the trial court was not *sua sponte* required to hold a new compeetency hearing five days after the previous one was not contrary to clearly established federal law, and Ground 3 accordingly fails.[1]

### E.  The S.J.C.'s State Law Decision That the Trial Court's Failure to Sua Sponte Hold a Voluntariness Hearing did not Require Reversal is Unreviewable Here.

Finally, Petitioner contends that the S.J.C.'s refusal to reverse the trial court's decision not to *sua sponte* hold a voluntariness hearing purportedly required by state law entitles him to relief.  The S.J.C. held that:

> Boateng claims that the judge erred in failing to hold a hearing and make a determination whether his statements on the day of the murder, including his statements to Moore, Moore's mother,  and the police, were voluntary.   He points out that a judge is required, *sua sponte*, to conduct a hearing regarding the voluntariness of statements made by a defendant when voluntariness is at issue, *see, e.g., Commonwealth v. Crawford*, 429 Mass. 60, 65, 706 N.E.2d 289 (1999), and that a defense of insanity, by raising questions about the defendant's state of mind, always makes voluntariness an issue in the case. *See Commonwealth v. Vazquez*, 387 Mass. 96, 99, 438 N.E.2d 856 (1982), quoting *Commonwealth v. Chung*, 378 Mass. 451, 457, 392 N.E.2d 1015 (1979) ("if the defendant comes forward with evidence of insanity at the time of his [statements], the judge is obliged initially to determine whether the statements were the 'product of a rational intellect as part of the issue of voluntariness' ").

---

[1]Mroreover, even if § 2254 did not bar relief, Petitioner could still not prevail since he seeks to create a new rule of constitutional criminal procedure on collateral review, in violation of *Teague v. Lane*, 489 U.S. 288 (1989).

We first note that Boateng has offered no authority for the proposition that statements made to Moore and her mother during the extended assault on Moore and Jameel enjoy the benefit of a voluntariness analysis. We similarly find no authority for such a conclusion. Voluntariness hearings are usually conducted to determine whether a defendant's statements to law enforcement officials after the fact are the "product of a rational intellect." *Commonwealth v. Vazquez*, *supra* at 99, 438 N.E.2d 856 (referring to statements "to law enforcement officers or their agents"). While the rule covers statements made by defendants to private parties in the aftermath of their criminal conduct, *see, e.g., Commonwealth v. Allen*, 395 Mass. 448, 455, 480 N.E.2d 630 (1985), we have never applied it to statements made by a defendant during the commission of his crime. Boateng was not entitled to a voluntariness hearing with regard to statements made to Moore and her mother during the criminal episode.

Boateng also claims that the judge should have conducted a hearing to determine the voluntariness of his statements to the police. These statements were made soon after the attacks. As we stated in *Commonwealth v. Vazquez, supra*, Boateng's defense of lack of criminal responsibility should have alerted the judge to his duty to conduct a voluntariness hearing before his statements to the police were used against him. It was error for the judge not to have conducted a hearing with regard to these statements. The question we must answer is whether this error requires reversal of the convictions.

Boateng's trial counsel did not request a voluntariness hearing, nor did he object to the failure to hold one. [The motion judge who heard the testimony of trial counsel as to why he had not requested a voluntariness hearing concluded that the failure to make the request was reasonable both because it was unlikely to succeed, and because some aspects of Boateng's statements were important to the insanity defense.][2] Although an objection may be resurrected in a motion for a new trial if the motion judge considers the unobjected-to error on its merits, *see Commonwealth v. Hallet*, 427 Mass. 552, 553, 694 N.E.2d 845 (1998), the judge here confined his analysis to whether Boateng's trial counsel had been ineffective and, if so, whether a miscarriage of justice had resulted. In such circumstances, Boateng's underlying claim of unpreserved error at trial was not resurrected. Consequently, we review the error to determine whether there is a "substantial likelihood" that a miscarriage of justice has resulted. *See Commonwealth v. Graham*, 431 Mass. 282, 286-287, 727 N.E.2d 51, cert. denied, 531 U.S. 1020, 121 S.Ct. 585, 148 L.Ed.2d 501 (2000).

---

[2]The bracketed text appears in the margin of the original.

We conclude that the failure of the trial judge to conduct a voluntariness hearing did not create a substantial likelihood of a miscarriage of justice. First, the testimony of the police as to their observations of Boateng's calm demeanor and actions after the assaults would have been admissible and probative on the question of sanity even if the specific statements made to them by Boateng had been excluded.  Second, Boateng's calm demeanor and lucid conversation suggest that any hearing on the issue of voluntariness would likely have resulted in the conclusion that Boateng's statements to the police were voluntary.  Third, the statements, although in part corroborative of sanity, were not central to the case, which turned largely on Moore's description of Boateng's attacks and the testimony of the experts regarding Boateng's mental illness.   Finally, the judge, pursuant to our "humane practice," *e.g., Commonwealth v. Serino*, 436 Mass. 408, 413, 765 N.E.2d 237 (2002), instructed the jury that they were to independently determine whether Boateng's statements were voluntary before considering them as evidence of guilt, thus mitigating any possible harm resulting from the judge's failure to hold a voluntariness hearing.  In sum, there was no substantial likelihood of a miscarriage of justice.

Supp. App. at E:7-8.  As Petitioner concedes, the error identified by the S.J.C. here is not one of federal law.  Pet. Mem. at 132.  Such errors are unreviewable on habeas corpus. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Even if a sufficiently egregious state law error was, as Petitioner argues, sufficient to violate federal law, this is far from such an error.  As the Court notes, the a voluntariness hearing was procedurally defaulted because Petitioner's counsel felt that the statements were likely helpful to the defense and did not wish them suppressed.  Moreover, as the S.J.C. pointed out, the jury was instructed to consider the voluntariness of the statements before using them against defendant in any case.  Habeas relief does not lie to correct errors of state law, and certainly not to remedy defaulted claims that likely had no effect on the verdict.  Claim 4 fails.

**Conclusion**

For these reasons respondent respectfully requests that the petition for habeas corpus be denied.

Respectfully submitted,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ David M. Lieber
David M. Lieber (BBO# 653841)
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200 ext.2827

ATTORNEYS FOR RESPONDENT

Dated: January 23, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on petitioner January 23, 2007, by complying with this court's directives on electronic filing.

/s/ David M. Lieber

26