UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 04-CV-10125-RWZ

Daniel Yeboah-Sefah,
Petitioner

v.

Edward Ficco,
Respondent

**MEMORANDUM OF LAW IN SUPPORT OF
REQUEST FOR CERTIFICATE OF APPEALABILITY**

The Petitioner in the above-referenced matter has sought a Certificate of Appealability (COA) from the denial of his Petition for habeas corpus pursuant to 28 U.S.C. § 2254. This memorandum is offered in support of that request.

### Standard of Review

Title 28 U.S.C. § 2253(c)(2) provides that in order to obtain a COA on an issue, an applicant must make a "substantial showing of the denial of a constitutional right." According to the United States Supreme Court, this standard requires that a petitioner

> sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" [Slack v. McDaniel,] 529 U.S. [473], at 484, (2000) (quoting Barefoot[ v. Estelle, 462 U.S. 880,] 893, n. 4, [1983]).

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was

1

debatable amongst jurists of reason. This threshold
inquiry does not require full consideration of the
factual or legal bases adduced in support of the claims.
In fact, the statute forbids it. . . . [A] COA does not
require a showing that the appeal will succeed.
Accordingly, a court of appeals should not decline the
application for a COA merely because it believes the
applicant will not demonstrate an entitlement to relief.
. . . It is consistent with § 2253 that a COA will issue
in some instances where there is no certainty of ultimate
relief. After all, when a COA is sought, the whole
premise is that the prisoner " 'has already failed in
that endeavor.' " Barefoot, supra, at 893, n. 4. . . .
[I]ssuance of a COA must not be pro forma or a matter of
course. A prisoner seeking a COA must prove " 'something
more than the absence of frivolity' " or the existence of
mere "good faith" on his or her part. Barefoot, supra, at
893. We do not require petitioner to prove, before the
issuance of a COA, that some jurists would grant the
petition for habeas corpus. Indeed, a claim can be
debatable even though every jurist of reason might agree,
after the COA has been granted and the case has received
full consideration, that petitioner will not prevail.

Miller El v. Cockrell, 537 U.S. 322, 336-38 (2003). Furthermore, the Courts have recognized the appropriateness of taking into account the severity of the sentence when deciding whether to issue a COA in a capital case. See Graves v. Cockrell, 352 F.3d 143, 150 (5th Cir. 2003), cert. denied, 541 U.S. 1057 (2004); Valerio v. Crawford, 306 F.3d 742, 767 (9th Cir. 2002) (en banc), cert. denied sub nom McDaniel v. Valerio, 538 U.S. 994 (2003); Jermyn v. Horn, 266 F.3d 257, 279 n.7 (3rd Cir. 2001).

Finally, the First Circuit has held that a district court may, and should, issue certificates of appealability in the first instance. See Grant-Chase v. Commissioner, 145 F.3d 431, 435 (1st Cir.), cert. denied, 525 U.S. 941 (1998) ("[W]e observe that every court of appeals that has considered the question has concluded

that a district judge may issue a COA. . . . [W]e endorse the[se] views . . . and explicitly now hold that a district judge has the authority under the AEDPA to issue a COA under 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b)").

**Petitioner's Claims**

## I.  THE DEFENDANT DID NOT MAKE A KNOWING, INTELLIGENT AND VOLUNTARY WAIVER OF HIS CONSTITUTIONAL RIGHT TO CONFLICT-FREE COUNSEL

There can be no dispute that Mr. Boateng had a constitutional right to the effective assistance of counsel which included the right to conflict-free counsel. See Wood v. Georgia, 450 U.S. 261, 271, 101 S. Ct. 1097 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.").  Furthermore, there was no dispute that defense counsel's simultaneous representation of the Commonwealth's medical examiner in an unrelated civil suit presented a conflict of interest.  The issue here was whether Mr. Boateng had made a knowing, intelligent and voluntary waiver of his right to conflict-free counsel. See Holloway v. Arkansas, 435 U.S. 475, 483 n.5, 98 S. Ct. 1173 (1978) (a defendant may waive his right to representation that is "unhindered by a conflict of interest").

Mr. Boateng made a two pronged attack on the validity of his alleged waiver of his right to conflict-free counsel.  First, he challenged the adequacy of the judge's colloquy.  Petitioner's Memorandum of Law in Support of His Petition for Habeas Corpus

3

(Mem.) (Document #29) at 26. In support of this proposition, he cited Von Moltke v. Gillies, 332 U.S. 708, 68 S. Ct. 316 (1948) (plurality opinion), in which the Supreme Court stated that before accepting a defendant's waiver of a constitutional right, "a judge must investigate [his waiver] as long and as thoroughly as the circumstances of the case before him demand." Petitioner's Reply to the Commonwealth's Opposition to His Memorandum of Law (Reply) (Document #45) at 2-3. Second, he asserted that notwithstanding the adequacy of the judge's colloquy a number of factors prevented Mr. Boateng from understanding the information the judge did provide to him and from making a knowing, intelligent and voluntary decision despite that information. Mem. at 26-27. Specifically, the combined effects of his mental illness and the four medications he was taking at the time of the conflict colloquy (Thioridazine, Amitriptyline, Clonazepam, and Lithium) caused him to become heavily sedated and confused. Furthermore, trial counsel did not present the conflict of interest issue to Mr. Boateng until the eve of trial, a point at which any criminal defendant facing a murder charge - much less a mentally ill defendant - would have been feeling intense psychological pressure and would have found it particularly difficult to make an independent decision to abandon his counsel. Finally, he was not provided an opportunity to consult with conflict-free counsel about the pros and cons of proceeding to trial with conflicted counsel. Mr. Boateng argued that this combination of factors prevented him from engaging in a

knowing and intelligent colloquy with the trial judge and thereby making a knowing, intelligent and voluntary waiver of his constitutional right to the effective assistance of conflict-free counsel.

The Court disposed of this issue as follows: "Petitioner had previously discussed the conflict with his counsel.  In addition, he had been found competent to stand trial five days before the colloquy.  Moreover, he offers no evidence that taking the prescribed dose of four medications rendered him incompetent to consent to the representation by this counsel."  Memorandum of Decision and Order (Op.) (Document #49) at 5.

Mr. Boateng respectfully submits that, notwithstanding this Court's assertions, he has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

First, neither the SJC nor this Court made any attempt to address the merits of Mr. Boateng's argument that the trial judge's waiver colloquy was inadequate.  The most important short-coming of this inadequacy was the trial judge's failure to inform Mr. Boateng of his right to consult with independent counsel.  In his original memorandum of law Mr. Boateng observed:

> Here, the issue is whether Mr. Boateng could make a knowing and intelligent waiver of his right to conflict-free counsel.  Given the nature of the decision, consultation with that conflicted counsel is not adequate.  See e.g. United States v. Malpiedi, 62 F.3d 465, 469 (2nd Cir. 1995) ("an attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics is hardly an objective judge of whether that strategy or tactic is sound trial practice").

5

Mem. at 30.  Therefore, this Court's observation that "Petitioner had previously discussed the conflict with his [conflicted] counsel" is meaningless.  Moreover, Mr. Boateng cited <u>Godinez v. Moran</u>, 509 U.S. 389, 402, 113 S. Ct. 2680 (1993), in which the Supreme Court stated, "when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted."  Mem. at 44.  Therefore, this Court's observation that Mr. Boateng had been found competent to stand trial five days earlier is likewise meaningless.

Second, the Court's claim that Mr. Boateng "offers no evidence that taking the prescribed dose of four medications rendered him incompetent to consent to the representation by this counsel" grossly mischaracterizes his claim and is factually inaccurate.

Mr. Boateng did not claim merely that taking the prescribed dose of four medications, by itself, rendered him incompetent to consent to representation by conflicted counsel.  Rather, he argued that a combination of factors, including the medication, the timing of the presentation of the conflict and the lack of independent counsel prevented Mr. Boateng from making a valid waiver.

Moreover, contrary to the Court's claim, Mr. Boateng <u>did</u> present evidence in support of this claim.  Specifically, several witnesses at the competency hearing testified that he could make decisions about his case only with the assistance of counsel.  Mem. at 28-29.  As noted above, the trial judge did not provide him with

independent counsel to assist him in deciding whether to proceed
with conflicted counsel.  Furthermore, to the extent that there was
any question about the evidence supporting Mr. Boateng's inability
to make a knowing, intelligent and voluntary waiver of his
constitutional right to conflict-free counsel without the
assistance and advise of independent counsel on the eve of his
murder trial, Mr. Boateng attempted to address this point in the
state court proceedings in connection with his second new trial
motion and again in this court.  Mr. Boateng intended to present
the testimony of a medical expert, forensic psychiatrist Julia
Reade, in support of his claim that this combination of factors
prevented him from making a knowing, intelligent and voluntary
waiver of his constitutional right to conflict-free counsel.  To
this end, he filed a motion for funds to hire Dr. Reade, along with
supporting affidavits from counsel and Dr. Reade.  P.S.A. 1:F-H.
He also filed a Motion for an Evidentiary Hearing, with the
intention of presenting Dr. Reade's testimony.  P.S.A. 1:I.  Both
the state court motion judge and this Court denied his request
without holding an evidentiary hearing.  P.S.A. 1:J-11.  Therefore,
having refused to hear from Dr. Reade it was fundamentally unfair
for the state court motion judge and this Court to claim that Mr.
Boateng had failed to present evidence in support of his claim.  As
a result, the refusal to grant an evidentiary hearing and take
testimony from Dr. Reade violated Mr. Boateng's  federal
constitutional right to due process of law.  See U.S. Const.,

7

Amend. XIV.

For all of these reasons, this Court's rejection of this claim was unreasonable. Mr. Boateng has, at the very least, made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Stated differently, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

## II.  THE DEFENDANT WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

Mr. Boateng obviously had the constitutional right to the effective assistance of counsel. See Strickland, 466 U.S. at 684-686, 104 S. Ct. 2052; Kimmelman v. Morrison, 477 U.S. 365, 377-378, 106 S. Ct. 2574 (1986) ("the right to counsel is the right to the effective assistance of counsel").

The question here is whether any of the six specific claims of ineffective assistance he raised here constituted "a substantial showing of the denial" of this constitutional right.

### A.  Trial Counsel's Conflict of Interest

As explained above, Mr. Boateng's trial counsel announced on

the first day of trial that he had a conflict of interest.  For the reasons explained above, Mr. Boateng submits that he did not make a knowing, intelligent and voluntary waiver of that conflict.  Mr. Boateng asserted further that the conflict deprived him of his constitutional right to the effective assistance of counsel.

As noted above, the Sixth Amendment right to the effective assistance of counsel includes the right to conflict-free counsel. See Wood v. Georgia, 450 U.S. 261, 271, 101 S. Ct. 1097 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.").

At the time of trial, Mr. Boateng's trial counsel informed the Court that he also represented Dr. Stanton Kessler, the Commonwealth's Medical Examiner, in a pending civil action.  Tr. 1:36-37.  Given that this was a murder case, and that Dr. Kessler had performed the autopsy, it was obvious that Dr. Kessler would be a key Commonwealth witness who would testify about critical evidence of the decedent's injuries and the cause of death.

This case presents an instance where defense counsel was engaged in the simultaneous representation of an important prosecution witness.  As a result, Mr. Boateng was "represented by counsel who might [have been] tempted to dampen the ardor of his defense in order to placate his other client."  Zuck v. Alabama, 588 F.2d 436, 439 (5th Cir. 1979).  As the Fifth Circuit recognized, this fact alone should be enough to establish an actual conflict of

interest warranting reversal of the conviction. A determination of adverse effects in this situation is particularly difficult because

> [d]etermining whether a particular attorney has yielded to the temptation a conflict presents requires a searching analysis of his performance at trial. A cold, dispassionate appellate transcript simply cannot provide an adequate basis for assessing such a performance, for subtle variations in demeanor and depth of cross-examination cannot be reflected in the pages of a transcript.

Id. In short, the mere fact that trial counsel simultaneously represented a key government witness and thus had an incentive not to challenge that witness's testimony as aggressively as he might otherwise have done was sufficient to establish an actual conflict of interest under the Sixth Amendment. Therefore, Mr. Boateng was denied the effective assistance of counsel.

Alternatively, counsel's conflict satisfied the two prong test established in United States v. Brien.[1] First, "some plausible alternative defense strategy or tactic might have been pursued."

---

[1] This Court stated described the test as follows:

> In order to establish an actual conflict of interest, the petitioner ordinarily must prove two elements. First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. Foxworth v. Wainwright, 516 F.2d 1072, 1079 (5th Cir. 1975). He need not show that the defense would necessarily have been successful if it had been used, but merely that it possessed sufficient substance to be a viable alternative. Id. Second, he must establish that the alternative defense was inherently in conflict with the attorney's other loyalties or interests. United States v. Martorano, 620 F.2d at 917; Foxworth v. Wainwright, 516 F.2d at 1079.

United States v. Brien, 695 F.2d 10, 15 (1st. Cir. 1982).

10

Brien, 695 F.2d at 15.  Specifically, counsel could have challenged
Dr. Kessler's testimony and conclusions about the amount of force
used and the timing of the child's death.

Dr. Kessler provided substantial support for the
Commonwealth's theory that Mr. Boateng acted with extreme atrocity
or cruelty.  First, Dr. Kessler provided a graphic and highly
prejudicial description of the force required to cause the baby's
chest injuries.  Specifically, he testified that the injuries were
similar to a case which he encountered in Florida where a seven
year old child had been "crushed in the jaws of an alligator or
crocodile".  Tr. 7:57-59.  Trial counsel failed to object to this
prejudicial testimony, much less challenge it on cross-examination.
Tr. 7:57-59.

Second, Dr. Kessler opined that the cause of death was
"multiple blunt traumatic injuries" including severe blunt head
trauma consisting of "multiple comminuted fractures" on the "right
paretal occipital temporal scalp."  Tr. 7:60.

Defense counsel could have challenged Dr. Kessler's
conclusions by calling his own forensic pathologist.  During the
hearing on the new trial motion, Mr. Boateng's appellate counsel
called Dr. Ira Kanfer, an associate medical examiner for the state
of Connecticut.  Dr. Kanfer stated that in his opinion the cause of
the child's death was blunt trauma to the head, MNT Tr. 2:149,
consistent with one blow to the child's head.  MNT Tr. 2:153-154,
181, 191.  The autopsy report photos showing a comminuted skull

11

fracture, S.A. 2:G-245, as well as Ms. Moore's claim that Mr. Boateng raised the child over his head and slammed him head-first onto the hardwood floor provided the basis for his opinion. MNT Tr. 2:149-150. While Dr. Kanfer agreed that the child suffered several other injuries, he felt that the cause of death was the "one blow" to the head, "which came first". MNT Tr. 2:154-157. This opinion was bolstered by the fact that there was no evidence that the child cried after the first blow. MNT Tr. 2:158. Had trial counsel solicited this opinion at trial he could have argued that the child died instantly as a result of the first blow and thus did not suffer for the remainder of the assault. This fact, in turn, would have been relevant to a determination whether the killing was, judged objectively, "extremely cruel or atrocious" as defined by state law. See Commonwealth v. Cuneen 389 Mass. 216, 228-29 (1983) (extreme atrocity or cruelty is to be determined by an objective standard).

Had counsel objected to Dr. Kessler's testimony comparing this case to one in which a child was crushed in the jaws of an alligator and presented the testimony of an independent forensic pathologist that the child's death was caused by the first blow, this would have provided a significant basis to argue that Mr. Boateng was not guilty of first degree murder by extreme atrocity or cruelty. In combination with an argument that Dr. Whaley felt Mr. Boateng's mental illness prevented him from acting with extreme atrocity or cruelty, see infra Argument II(D), this would have

12

amounted to something far more than a "plausible alternative defense strategy." <u>Brien</u>, 695 F.2d at 15.

While one might reasonably question the likely success of an attack on Dr. Kessler's conclusions, the First Circuit has clearly stated that a defendant alleging a forfeited defense as a result of a conflict of interest "need not show that the defense would necessarily have been successful if it had been used, but merely that it possessed sufficient substance to be a viable alternative." <u>Brien</u>, 695 F.2d at 15. Mr. Boateng submits that he has satisfied this lower hurdle. The determination whether Mr. Boateng acted with extreme atrocity or cruelty was a purely factual jury question. <u>See</u> <u>Cunneen</u>, 389 Mass. at 227 (enumerating factors jury may consider in determining whether crime was objectively extremely cruel or atrocious). No one can say with any assurance how evidence that the child died almost instantly and that the vast majority of the injuries were suffered post-mortem would have affected the jury's deliberations on this important factual question. In any event, the jury certainly would have been free to reject the government's claim that Mr. Boateng acted with extreme atrocity or cruelty.

This Court completely ignored Mr. Boateng's first argument that the "adverse effects" test articulated in <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 100 S. Ct. 1708 (1990), and <u>Mickens v. Taylor</u>, 535 U.S. 162, 122 S. Ct. 1237 (2002), does not apply in cases such as this one where defense counsel simultaneously represents a key

government witness whom he will have to cross-examine at trial. Cf. United States v. Segarra-Rivera, 473 F.3d 381, 385 & n.3 (1st Cir. 2007) (holding that adverse effects test announced in Cuyler and Mickens did not apply to conflict of interest at issue). Mr. Boateng respectfully submits that this, by itself, amounts to a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of the effective assistance of counsel, which warrants a COA. This Court's complete silence on the issue provides no basis to deny a COA and therefore this Court is obligated to grant the COA. See Fed. R. App. P. 22(b)(1) ("If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue.").

Furthermore, while this court adopted the SJC's holding that counsel's conflict was only "potential" and not "actual", op. at 7, it did not address the substance of Mr. Boateng's argument, summarized above, that the conflict adversely affected his defense and therefore was actual. In fact, this Court's analysis of the issue was both legally and factually flawed.

First, this Court stated that Mr. Boateng "has not demonstrated the prejudice required under Strickland [v. Washington]." Op. at 7 (emphasis added). The Supreme Court has clearly stated that where the issue is whether a defense attorney labors under an actual conflict of interest, the defendant need not show prejudice in order to obtain a reversal of his conviction.

14

Burger v. Kemp, 483 U.S. 776, 783, 107 S. Ct. 3114 (1987); Cuyler
v. Sullivan, 446 U.S. 335, 347, 100 S. Ct. 1708 (1980); Holloway,
435 U.S. at 489, 98 S. Ct. 1173; see Glasser, 315 U.S. at 75-76, 62
S. Ct. 457 ("the right to have the assistance of counsel is too
fundamental and absolute to allow courts to indulge in nice
calculations as to the amount of prejudice arising from its
denial.").

     Second, the Court asserted that "[t]he argument [that counsel
could have attacked Dr. Kessler's opinion on the cause of death]
fails because the SJC held as a matter of state law, that even a
single blow, especially when directed against an infant, may
support a finding of extreme atrocity or cruelty." Op. at 8. This
argument ignored Mr. Boateng's response:

> Mr. Boateng does not dispute that the jury heard
> sufficient evidence to warrant a conclusion that the
> killing was a product of extreme atrocity or cruelty.
> Rather, he claims . . . that Dr. Kanfer's testimony would
> have given the jury a plausible factual basis to reject
> a claim that the killing was extremely atrocious or
> cruel.

Mem. at 65. That is, if the jury had heard and believed Dr.
Kanfer's opinion that death was caused by the first blow, this
would have provided a potential basis to reject a claim that the
killing was extremely cruel or atrocious.

     In sum, given that this Court's only justification for
rejecting Mr. Boateng's argument that his counsel's conflict of
interest deprived him of his constitutional right to the effective
assistance of counsel was both legally and factually flawed, Mr.

Boateng respectfully submits that this Court's decision is unreasonable. In any event, Mr. Boateng submits that he has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that this defense "possessed sufficient substance to be a viable alternative." Brien, 695 F.2d at 15. At the very least, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

**B. Trial Counsel Failed to Challenge the Admissibility of the Defendant's Statements to Civilian Witnesses and to the Police**

Mr. Boateng next alleged that his trial counsel provided ineffective assistance because he failed to challenge the admissibility of Mr. Boateng's statements to Ms. Hall, Ms. Moore and the police in the immediate aftermath of the crimes. Mr. Boateng alleged that trial counsel should have challenged the admissibility of his statements to the police on the grounds that he could not provide a knowing and intelligent waiver of his Miranda rights. Furthermore, he alleged that his trial counsel should have challenged the admissibility of his statements to Ms. Moore, Ms. Hall and the police on the grounds that the statements were not voluntary.

**1. Trial Counsel Should Have Challenged the**

**Admissibility of the Defendant's Statements to the Police on the Grounds That He Could Not Provide a Knowing and Intelligent Waiver of His <u>Miranda</u> Rights**

It is settled that statements obtained from a suspect during custodial interrogation may be admitted at trial only if the prosecution demonstrates that the warnings and procedures required by <u>Miranda v. Arizona</u>, 384 U.S. 436, 475, 86 S. Ct. 1602 (1966), were scrupulously observed, and that the suspect "knowingly, intelligently and voluntarily" waived his privilege against self-incrimination. <u>See</u> <u>Id.</u> 384 U.S. at 475, 86 S. Ct. 1602.

At the hearing on his motion for a new trial, Mr. Boateng presented two medical experts, Dr. Spiers and Dr. Brown, who provided opinions that due to mental illness he was unable to knowingly and intelligently waive his <u>Miranda</u> rights. (Dr. Spiers, MNT Tr. 1: 50-65)(Dr. Brown, MNT Tr. 4:266-273). Therefore, his statements to police following <u>Miranda</u> warnings should have been deemed inadmissible.

This Court rejected Mr. Boateng's claim on two grounds. First, the Court claimed that trial counsel's decision not to object to the admissibility of the statements was reasonable because "the statements were consistent with [Mr. Boateng's] insanity defense." Op. at 8. Second, the Court claimed that the statements "were not central to the case". <u>Id.</u> Respectfully, both of these claims are, at the very least, highly debatable. Mr. Boateng anticipated both arguments and addressed them at length in

17

his original memorandum of law.  This Court completely ignored his arguments.

At the hearing on the new trial motion, trial counsel claimed that the statements were "not that harmful to the insanity defense".  MNT Tr. 5:371.  In response, Mr. Boateng noted that the Commonwealth relied heavily on these statements to attack Mr. Boateng's criminal responsibility defense.    During cross-examination of Dr. Rosemarin, the prosecutor asked whether Mr. Boateng's statements indicated both consciousness of guilt and that he had been engaged in "goal directed behavior".  Tr. 9:14-16, 20-21.  Dr. Rosemarin conceded that they did.  Tr. 9:16.  Compare Miller v. Dugger, 838 F.2d 1530, 1542 (11th Cir. 1988).

Thereafter, Dr. Whaley, the Commonwealth's expert, relied on the same evidence to refute Mr. Boateng's insanity defense. Specifically, Dr. Whaley testified that Mr. Boateng's conversations with the police were indicative of "goal-directed" behavior, "namely, to essentially avoid responsibility" for his actions, and also were consistent with a capacity to appreciate the wrongfulness of his conduct.  Tr. 9:121-122.  Dr. Whaley concluded that Mr. Boateng's alleged statements, as reported by the police, indicated too much "goal-directed" activity to meet the McHoul standard for lack of criminal responsibility.  Tr. 9:137-138, 199, 205, 206-207. Compare Miller v. Dugger, 838 F.2d at 1542 (admission of defendant's statement in absence of determination whether his waiver of Miranda rights was knowing and intelligent was not

harmless error because prosecution expert relied on defendant's statement to support conclusion that he was not insane).

Furthermore, the prosecutor relied heavily on Mr. Boateng's statements to police in his closing argument to show that he could think rationally and logically after the incident:

> <u>And what about his statement to the police</u>? The business about Detective Genduso, if you recall, and Mr. Boateng both sitting in the kitchen or sitting downstairs in that apartment, calmly, no bizarre behavior, <u>telling Detective Genduso about a tug of war with the baby and that he doesn't think it fell on the floor</u>. I think that was the statement.

Tr. 10:123-124 (emphasis added). The prosecutor made several additional references to Mr Boateng's statements during his closing argument (Tr. 10:100, 121-123) in an effort to attack his criminal responsibility defense. By contrast, Mr. Boateng's trial counsel made no references to his statements to police officers.

Notwithstanding his claim that Mr. Boateng's statements were not that harmful to an insanity defense, trial counsel attacked Officer Lombardi's credibility on the grounds that he did not include in his police report Mr. Boateng's statement concerning injuries to the child. Tr. 5:190-193; S.A. 2:G-337. Trial counsel's vigorous attacks on the police officer's credibility were intended to create a doubt in the jurors' minds as to the accuracy of the purported statements. Yet, his rationale for not challenging such inculpatory statements to the police was that they provided support for the insanity defense. MNT Tr. 5:368-372. Clearly, his <u>post</u> <u>hoc</u> justification for not challenging the

19

statements was inconsistent with the manner in which he actually tried the case.

In short, given the prejudicial impact of Mr. Boateng's statements to the police, trial counsel's failure to challenge their admissibility could not be viewed as a reasonable "strategic choice", <u>Strickland</u>, 466 U.S. at 690, 104 S. Ct. 2052, and therefore was deficient performance. <u>Id.</u> at 687, 104 S. Ct. at 2064.

Mr. Boateng respectfully submits that this Court's rejection of his ineffective assistance claim is unreasonable. In any event, Mr. Boateng submits that he has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to the effective assistance of counsel. At the very least, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." <u>Miller El</u>, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. <u>See id.</u> at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

> **2. Trial Counsel Should Have Challenged the Admissibility of the Defendant's Statements to Ms. Moore, Ms. Hall and the Police on the Grounds That The Statements Were Not Voluntary**

Apart from the validity of the <u>Miranda</u> waiver, due process requires a separate inquiry into the voluntariness of the

20

defendant's statements.  See  Jackson v. Denno, 378 U.S. 368, 376-379, 84 S. Ct. 1774 (1964).  See also  Miller v. Dugger, 838 F.2d at 1537-1539 (extensive discussion of distinction between argument that defendant lacked the ability to make a knowing and intelligent waiver of Miranda rights and argument that defendant's statement was involuntary).

In this case, the SJC conceded that as a matter of state law, "a defense of insanity, by raising questions about the defendant's state of mind, always makes voluntariness [of a statement] an issue in the case."  Boateng, 438 Mass. at 504.  Furthermore, the SJC acknowledged in this case that this rule "covers statements made by defendants to private parties" as well as the police.  Boateng, 438 Mass. at 504.

In addition to his confession to police, Mr. Boateng made one statement to Ms. Hall and one statement in the presence of Ms. Moore that defense counsel should have moved to suppress.  First, shortly after the attacks, Ms. Hall called on the phone.  When Mr. Boateng answered, Ms. Hall asked to speak to Ms. Moore.  Mr. Boateng allegedly said that she was downstairs doing laundry.  Tr. 5:200.  Second, when Ms. Hall came to the apartment and knocked on the door, Mr. Boateng became disconsolate, went into the bathroom and drank from a container of bleach, saying in Ms. Moore's presence that he would not go to jail.  Tr. 5:87, 157-58.

At the hearing on the motion for a new trial, Dr. Spiers testified that for essentially the same reasons he lacked the

21

ability to make a knowing and intelligent waiver of his <u>Miranda</u> rights, Mr. Boateng lacked the mental capacity to make voluntary statements to the police or to Ms. Moore and Ms. Hall. MNT Tr. 1:61-65. Again, Dr. Brown shared Dr. Spiers' opinion. MNT Tr. 4:272-273.

As noted above, this Court rejected Mr. Boateng's claim on the grounds that "the statements were consistent with [Mr. Boateng's] insanity defense" and that they "were not central to the case." Op. at 8. Mr. Boateng has noted above that he anticipated these arguments in connection with his statements to the police and that this Court ignored his arguments. In his original memorandum, he also explained the prejudicial impact of his statements to Ms. Hall and Ms. Moore. Again, this Court ignored his arguments.

First, Mr. Boateng noted that the Commonwealth relied heavily on the statements to Ms. Hall - in addition to the statements to police - to attack Mr. Boateng's criminal responsibility defense. Dr. Whaley testified that Mr. Boateng's conversation with Ms. Hall (claiming that Ms. Moore was downstairs doing laundry) was indicative of "goal-directed" behavior, "namely, to essentially avoid responsibility" for his actions, and also was consistent with a capacity to appreciate the wrongfulness of his conduct. Tr. 9:121-122.

Mr. Boateng also noted that notwithstanding trial counsel's claim that Mr. Boateng's statements to Ms. Moore were not that harmful to an insanity defense, he attacked Ms. Moore's credibility

during his closing argument. Tr. 10:67, 68-69. Trial counsel's vigorous attacks on Ms. Moore's credibility were intended to create a doubt in the jurors' minds as to the accuracy of Mr. Boateng's purported statements to her. Yet, counsel's rationale for not challenging such inculpatory statements was that they provided support for the insanity defense. MNT Tr. 5:368-372.

Notwithstanding trial counsel's claim to the contrary, the statements attributed to Mr. Boateng by Ms. Hall, Ms. Moore and the police were extremely prejudicial to Mr. Boateng's criminal responsibility defense because they tended to establish the presence of rational intellect. See Commonwealth v. Sheriff, 425 Mass. 186, 192-95, 680 N.E.2d 75 (1997) (judge's failure to conduct voir dire on voluntariness of defendant's statements in first degree murder case was reversible error because voluntariness of statements was live issue, defendant raised criminal responsibility defense and statements undermined that defense); Hunter, 416 Mass. at 832-35, 626 N.E.2d 873 (same). This Court offered no rebuttal to this argument.

Moreover, the SJC itself conceded that one of the central issues in the case was evidence of Mr. Boateng's mental illness. See Boateng, 438 Mass. at 506 (the case "turned largely on Moore's description of Boateng's attacks and the testimony of the experts regarding Boateng's mental illness"). Given that one of the central issues was Mr. Boateng's mental state, the fact that Mr. Boateng's statements were - in the SJC's words - "corroborative of

23

sanity" made them highly relevant to that central issue.  Id. at
505-06.  See Sheriff, 425 Mass. at 192-95, 680 N.E.2d 75 (judge's
failure to conduct voir dire on voluntariness of defendant's
statements in first degree murder case was reversible error because
voluntariness of statements was live issue, defendant raised
criminal responsibility defense and statements undermined that
defense); Hunter, 416 Mass. at 835, 626 N.E.2d 873 (same).

In short, given the prejudicial impact of Mr. Boateng's
statements to Ms. Moore and Ms. Hall, trial counsel's failure to
challenge their admissibility could not be viewed as a reasonable
"strategic choice", Strickland, 466 U.S. at 690, 104 S. Ct. 2052,
and therefore was deficient performance.  Id. at 687, 104 S. Ct. at
2064.

Once again, Mr. Boateng respectfully submits that this Court's
rejection of his ineffective assistance claim is unreasonable.  In
any event, he submits that he has made a "substantial showing", 28
U.S.C. § 2253(c)(2), that he was deprived of his constitutional
right to the effective assistance of counsel.  At the very least,
"the District Court's application of AEDPA to petitioner's
constitutional claims . . . was debatable amongst jurists of
reason." Miller El, 537 U.S. at 337.  Therefore, he is entitled to
a COA on this issue.  See id. at 338 ("a claim can be debatable
even though every jurist of reason might agree, after the COA has
been granted and the case has received full consideration, that
petitioner will not prevail").

24

C.   **Trial Counsel Failed to Produce a Mental Health Expert as Promised**

1.   **Trial Counsel's Broken Promise Undermined His Criminal Responsibility Defense**

Mr. Boateng next alleged that his trial counsel provided ineffective assistance because he failed to present the testimony of a psychologist in support of an insanity defense as he had promised during his opening statement.

In two federal habeas cases arising out of Massachusetts state court convictions, the First Circuit reversed the defendants' convictions because in both cases defense counsel promised, during his opening statement, to present the testimony of an important defense witness, and then failed to do so.  See Ouber v. Guarino, 293 F.3d 19, 35 (1st Cir. 2002); Anderson, 858 F.2d 16, 19 (1st Cir. 1988).  More specifically, Anderson, like this case, involved a charge of first degree murder and the defense attorney promised in his opening statement, as in this case, to present the testimony of a psychiatrist and a psychologist in support of a "diminished capacity" defense.[2]  See Anderson, 858 F.2d at 17.  In describing the importance of such testimony in a first degree murder case, the First Circuit stated,

---

[2]  While Massachusetts does not recognize a formal "diminished capacity" defense, this phrase is often used as short-hand for a defense that a defendant, who may have had the mental state for second degree murder as defined by state law, lacked the mental state necessary for a conviction of first degree murder.  See Commonwealth v. Candelario, 446 Mass. 847, 857, 848 N.E.2d 769 (2006).

> The promise was dramatic, and the indicated testimony strikingly significant. The first thing that ultimately disappointed jurors would believe in the absence of some other explanation, would be that the doctors were unwilling, viz., unable, to live up to their billing. This they would not forget.

Id.

In both cases, the First Circuit held that defense counsel's decision to promise specific testimony in his opening and subsequent failure to keep his promise was objectively unreasonable and therefore constituted "deficient" performance as the term is used in Strickland. See Ouber, 293 F.3d at 28; Anderson, 858 F.2d at 17. Furthermore, in both cases, the Court held that there was a reasonable probability that this deficient performance affected the outcome of the case and therefore the error was "prejudicial". See Ouber, 293 F.3d at 33-34 ("The error here - failing to present the promised testimony of an important witness - was not small but monumental"); Anderson, 858 F.2d at 17 ("little is more damaging than to fail to produce important evidence that had been promised in an opening"). Mr. Boateng submits that this case is materially indistinguishable from Anderson and Ouber.

In this case, trial counsel promised, in his opening statement, that he would present testimony from "both psychologists and psychiatrists" to show that on October 25, 1992:

> [the defendant] came into a psychotic state, a break with reality. It was during that deep depression and that break of deep reality that he did the crazy, unbelievable awful things that he did to Alicia Moore and to a helpless five-week old baby that day.

26

Tr. 5:35-37.

After the Commonwealth rested its case, trial counsel presented David Rosemarin, a psychiatrist who testified for approximately one and one half days in support of the defense of lack of criminal responsibility. Dr. Rosemarin opined that Mr. Boateng suffered from a mental disease, most likely schizo-affective disorder, with a possible secondary diagnosis of a major depression with psychotic features, and was "grossly psychotic" at the time he assaulted the child. Tr. 8:96-97. As a result, Dr. Rosemarin testified, Mr. Boateng did not have the substantial capacity to conform his conduct toward Jameel Moore to the requirements of the law. Tr. 8:96-97. See Commonwealth v. McHoul, 352 Mass. 544, 546-547, 226 N.E.2d 556 (1967) (establishing criminal responsibility test under Massachusetts law). However, Dr. Rosemarin stated that he was unable to form an opinion regarding Mr. Boateng's mental state during the attack on Alicia Moore. Tr. 8:96-97, 102-103; 9:23.[3]

Defense counsel never presented the testimony of Dr. Paul Spiers, the "psychologist" promised in his opening statement[4], nor

---

[3] The prosecutor exploited Dr. Rosemarin's failure to offer an opinion on Mr. Boateng's criminal responsibility for Ms. Moore's serious injuries during his closing argument. Tr. 10:124-125. Argument II(C)(2) asserted ineffective assistance of counsel for  failure to provide a defense to charges related to Ms. Moore.

[4] Prior to jury impanelment, trial counsel filed a Motion for a Continuance to ensure the availability of both Dr. Rosemarin and Dr. Spiers in order to "put them on as a unit" in

27

did he give any explanation for Dr. Spiers' failure to testify. At the hearing on the new trial motion, Dr. Spiers made clear that he was available to testify at Mr. Boateng's trial but was never contacted. MNT Tr. 1:40. He also explained that in his opinion Mr. Boateng was not criminally responsible for his actions on October 25, 1992, concerning his assaults on <u>both</u> Jameel Moore and Alicia Moore. MNT Tr. 1:34-35. He added that he had forwarded a letter to trial counsel which provided a "brief summary" of this opinion. MNT Tr. 1:39; S.A. 2:G-240.

Trial counsel's decision to rely only on Dr. Rosemarin's testimony was especially prejudicial in this case given Dr. Rosemarin's lack of courtroom experience. The prosecutor fully exploited this lack of experience during cross-examination of Dr. Rosemarin and in closing argument. On cross-examination, the prosecutor established that Dr. Rosemarin had evaluated "maybe" three dozen cases and testified only twice before regarding criminal responsibility, never before a jury or during a murder trial. Tr. 8:105-107. During his closing argument the prosecutor juxtaposed Dr. Rosemarin's lack of experience against Dr. Whaley's extensive experience. Tr. 10:119. This line of argument would not have been available to the prosecutor if Dr. Spiers had testified

---

support of the defense of lack of criminal responsibility regarding both the assaults on Alicia Moore and the death of Jameel Moore. Tr. 1:6-9, MNT Tr. 5:418; S.A. 2:F-31. Thereafter, Dr. Spiers' name was read to the jury from the list of witnesses. Tr. 4:13; MNT Tr. 5:460; S.A. 2:F-27.

because Dr. Spiers had considerable forensic experience.  At the
time of trial (1994) he had been practicing for nearly twenty years
and had had a forensic practice for ten years.  MNT Tr. 1:29.

   While trial counsel offered several justifications for his
decision not to call Dr. Spiers, none of them addressed his
decision to promise the jury that they would hear from Dr. Spiers.
Given the complete lack of justification for this obviously
prejudicial decision, it could not possibly be viewed as a
reasonable "strategic choice."  Strickland, 466 U.S. at 690, 104 S.
Ct. 2052.

   This Court cited the SJC's observation that

   Dr. Spiers . . . approached Mr. Boateng's illness from a
   completely different angle, the angle of a
   neuropsychologist rather than that of a psychiatrist.  A
   diagnosis of Epstein-Barr virus and seizures could
   certainly have confused a jury that had, until that
   point, heard fairly consistent testimony that Boateng
   suffered from a different serious mental condition.
   Trial counsel, who had consulted with Dr. Spiers prior to
   trial, elected not to call him in an effort to avoid this
   confusion.

Op. at 9, quoting Boateng, 438 Mass. at 514.  This Court concluded
that trial counsel's decision not to present the testimony of two
different experts was "a reasonable trial strategy."  Op. at 9.

   As Mr. Boateng noted in his original memorandum of law, this
reasoning ignored the harm done by trial counsel's failure to keep
the promise he had made to the jury during his opening statement.
Compare Anderson, 858 F.2d at 19 (the state court analyses of the
pros and cons of calling the promised witness ignored the fact that

29

defense counsel broke the promise he made in his opening statement). Given that Dr. Spiers was a neuropsychologist, a fact of which counsel was obviously aware when he promised the jury he would call a psychologist, the fact that he approached the case from "the angle of a neuropsychologist" could not possibly have been surprising to trial counsel when he promised the jury he would call Dr. Spiers. Thus, Dr. Spiers' different approach could not possibly have been a justification for trial counsel's decision not to call him as a witness after promising the jury in his opening statement that he would call a psychologist.

In sum, Dr. Spiers' testimony went to the core of the defense. Given trial counsel's promise to the jury that he would present the testimony of a psychologist, the fact that he broke that promise, and the likely effect of that broken promise, trial counsel's failure to present the more experienced Dr. Spiers to bolster Dr. Rosemarin's opinion was deficient performance that prejudiced the defense. Strickland, 466 U.S. at 687, 104 S. Ct. 2052.

Yet again, Mr. Boateng respectfully submits that this Court's rejection of his ineffective assistance claim is unreasonable. In any event, Mr. Boateng submits that he has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to the effective assistance of counsel. At the very least, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is

30

entitled to a COA on this issue.  See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

### 2. Trial Counsel's Broken Promise Caused the Abandonment of the Only Defense to Assault Charges Against Alicia Moore

Mr. Boateng next alleged that his trial counsel provided ineffective assistance because he failed to develop a defense to charges that he assaulted Ms. Moore, despite a clear opportunity to do so in the testimony of Dr. Spiers.  He was aware that Dr. Spiers had concluded that Mr. Boateng lacked criminal responsibility for the assaults on both Alicia and Jameel Moore.  MNT Tr. 1:34-35; S.A. 2:G 241-242.  In his opening counsel had promised the jury that he would provide such testimony.  Tr. 5:35-37.

Counsel was aware that Dr. Rosemarin, unlike Dr. Spiers, had no opinion on Mr. Boateng's criminal responsibility for his actions toward Ms. Moore.  Tr. 8:96-97, 102-103; 9:23.  Therefore, the failure to present Dr. Spiers, the only defense witness with an opinion concerning the assault on Ms. Moore, "substantially damaged the very defense he primarily relied on".  Anderson, 858 F.2d at 19.  Had Dr. Spiers testified, the jury could have concluded reasonably that Mr. Boateng was not criminally responsible at the time of the assaults on both Ms. Moore and Jameel.

By informing the jury that Mr. Boateng had committed the acts resulting in Ms. Moore's injuries, Tr. 5:35-37, and presenting no

evidence as to his lack of criminal responsibility for such assault, trial counsel, in effect, left Mr. Boateng with no defense to the assault charges concerning Ms. Moore.

This Court adopted the reasoning of the SJC in rejecting this claim. Op. at 9. While conceding that Dr. Spiers's testimony "might" have provided Mr. Boateng with "a more complete defense" in the sense that he was of the opinion that Mr. Boateng was not criminally responsible for the attack on Ms. Moore, the SJC concluded that "it is unlikely that the jury, who rejected Boateng's insanity as a defense to the murder of Jameel, would have accepted it regarding the assault on Moore that occurred just before." Boateng, 438 Mass. at 514. Despite the fact that Mr. Boateng addressed this argument in his memorandum of law, this Court ignored his reasoning.

Mr. Boateng explained that the SJC's conclusion was unreasonable because it relied on the jury's rejection of his insanity as a defense to the murder of Jameel. Yet, this finding occurred only after counsel had made several missteps in the presentation of the insanity defense, including failing to challenge the admissibility of Mr. Boateng's statements to Ms. Moore, Ms. Hall and the police (Argument II(B) supra) and breaking the promise he made in his opening statement to call Dr. Spiers as a witness to corroborate the opinion of the much less experienced Dr. Rosemarin that Mr. Boateng was not criminally responsible for the death of Jameel. See Argument II(C)(1) supra. Mr. Boateng

submits that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different," Strickland, 466 U.S. at 694, 104 S. Ct. 2052, keeping in mind that "although the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent." Ouber, 293 F.3d at 25-26.  See Strickland, 466 U.S. at 693, 104 S. Ct. 2052 (explaining that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case").  If there is a reasonable probability that the jury would have accepted the insanity defense with regard  to the attack on Jameel, then Mr. Boateng submits that there is a reasonable probability that the jury would have accepted the insanity defense with regard the attack on Ms. Moore.

Once again, this Court's rejection of his ineffective assistance claim is unreasonable.  In any event, Mr. Boateng has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to the effective assistance of counsel.  At the very least, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

33

D.  **Trial Counsel Failed to Solicit Expert Opinion That the Defendant's Mental Illness Prevented Him from Appreciating That He Had Acted with Extreme Atrocity or Cruelty in the Death of His Son**

Mr. Boateng next alleged that his trial counsel provided ineffective assistance because he failed to solicit an opinion from the Commonwealth's mental health expert, psychiatrist Marc Whaley, that Mr. Boateng lacked the capacity to commit first degree murder with extreme atrocity or cruelty.

Trial counsel presented an insanity defense. Specifically, he presented the testimony of a psychiatrist that as a result of a major mental illness, Mr. Boateng lacked the substantial capacity to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of the law. Tr. 8:96-98.

In rebuttal, the Commonwealth presented the testimony of Dr. Whaley, who was appointed by the Court as an independent psychiatric examiner. Dr. Whaley prepared a report of his findings for the Court. In that report, he wrote that it would be reasonable to conclude that Mr. Boateng satisfied the requirements for diminished capacity; that is, his mental illness affected his ability to premeditate (i.e. weigh the pros and cons of his contemplated actions). P.S.A. 1:D. Defense counsel received a copy of that report prior to trial.

Dr. Whaley testified at trial that in his opinion Mr. Boateng did in fact suffer from a major mental illness at the time he killed his son - specifically, major depression with possible

psychotic features.  Tr. 9:148-49.  Furthermore, while he did not believe that Mr. Boateng's mental illness was so debilitating that he lacked all criminal responsibility for the death of his son, Tr. 9:137, he did conclude that Mr. Boateng's mental illness affected his capacity to premeditate, which he defined as the ability to weigh the pros and cons of carrying out his aggressive wishes.  Tr. 9:199.  Finally, he testified that at the time of the killing, Mr. Boateng's capacity for premeditation was impaired.  Id.

Despite Dr. Whaley's conclusion in his report that Mr. Boateng satisfied the requirements of diminished capacity, and his opinion at trial that Mr. Boateng's mental illness impaired his capacity for deliberate premeditation, defense counsel did not ask Dr. Whaley whether Mr. Boateng's mental illness deprived him of the capacity to appreciate whether his acts were extremely atrocious or cruel, or whether it deprived him of the capacity to stop committing such acts - an opinion which would have amounted to a defense to first degree murder on a theory of extreme atrocity or cruelty.  Likewise, defense counsel did not solicit such an opinion from his own mental health expert.

The jury convicted Mr. Boateng of first degree murder on a theory of extreme atrocity or cruelty.  They did not find him guilty of first degree murder on a theory of deliberate premeditation.

Had trial counsel pursued the matter, Dr. Whaley would have testified that Mr. Boateng's mental illness affected his ability to

appreciate the cruelty and atrocity of his actions. P.S.A. 1:D-3. Dr. Whaley would have testified that while Mr. Boateng probably had the intellectual capacity to know that he was inflicting pain and suffering on his son, his mental illness had impaired his capacity to fully appreciate the nature of his actions on a corresponding emotional level. Id. At the point Mr. Boateng picked up his son from his crib and threw him on the ground, Dr. Whaley believed the baby had become completely objectified and dehumanized to him as a result of his mental illness. Id. In other words, he had lost the ability to empathize with the baby as another human being. Id. In short, Dr. Whaley would have testified that Mr. Boateng's mental illness prevented him from appreciating that he was acting with extreme atrocity or cruelty when he killed his son. Id.

Trial counsel's failure to elicit Dr. Whaley's opinion that Mr. Boateng's mental illness affected his ability to appreciate the cruelty or atrocity of his actions was deficient performance. Strickland, 466 U.S. at 687, 104 S. Ct. 2052. Moreover, because Dr. Whaley testified that Mr. Boateng lacked the ability to act with deliberate premeditation and the jury acquitted Mr. Boateng of deliberately premeditated murder, Mr. Boateng submits that if the jury had heard Dr. Whaley's opinion that Mr. Boateng's mental illness affected his ability to appreciate the cruelty or atrocity of his actions, there is a reasonable probability that they would have acquitted him of first degree murder with extreme atrocity or cruelty as well. In other words, there is "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different," Strickland, 466 U.S. at 694, 104 S. Ct. 2052, keeping in mind that "although the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent." Ouber, 293 F.3d at 25-26.  See Strickland, 466 U.S. at 693, 104 S. Ct. 2052 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case").

This Court's only response to this claim was that it was a variant of Argument II.A. - a claim that Mr. Boateng was deprived of the effective assistance of counsel because his trial attorney had a conflict of interest.  Op. at 9.  While it is not clear to Mr. Boateng what the Court meant by this, his best guess is that the Court was referring to the viability of a challenge to Dr. Kessler's testimony and a defense to first degree murder on a theory of extreme atrocity or cruelty on the grounds that death was caused by a single blow.  The Court had held that because first degree murder based on extreme atrocity or cruelty may be the result of a single blow, there was no ineffective assistance in failing to raise a defense to this claim.  If this is in fact what the Court meant then it's assertion is a virtual non sequitur.  Dr. Whaley's testimony had nothing to do with the number of blows Mr. Boateng struck; rather, he would have addressed whether Mr. Boateng's mental illness provided a completely different defense to this theory of murder.  Moreover, this Court completely ignored Mr.

Boateng's request for an evidentiary hearing on this issue, which was supported by an affidavit from Dr. Whaley confirming that he would have testified that in his opinion, Mr. Boateng's mental illness prevented him from appreciating the cruelty and atrocity of his actions.

Once again, this Court's rejection of his ineffective assistance claim is unreasonable. In any event, Mr. Boateng has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to the effective assistance of counsel. At the very least, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

**E.    Trial Counsel Failed to Object to Erroneous Jury Instruction on the Voluntariness of the Defendant's Statements**

Mr. Boateng next alleged that his trial counsel provided ineffective assistance because he failed to object to the trial judge's erroneous jury instructions on the so-called "humane practice" rule - that is, the Commonwealth has the burden of proving beyond a reasonable doubt that any statements made by the defendant were voluntary and that the jury must disregard any such statements unless the Commonwealth has met its burden.

38

The trial judge instructed the jury as follows:

> Let me also talk to you just briefly about the necessity
> that any statements that are attributed to a defendant be
> shown, first of all, to have been voluntary before you
> can consider them at all. The law requires that
> statements that are attributed to a defendant be the
> product of a rational intellect and a free will, and not
> the product of some debilitated mental condition or
> product of coercion or some other circumstances that
> indicates that it is not the product of a rational
> intellect or free will. So before you consider any
> statements attributed to the defendant, be sure that you
> consider first and you determine that they are voluntary.

Tr. 10:140.

Most importantly, this instruction failed to inform the jury
that as a matter of state law the Commonwealth had the burden of
proving the voluntariness of Mr. Boateng's statements beyond a
reasonable doubt. Hunter, 416 Mass. at 834, 626 N.E.2d 873; Allen,
395 Mass. at 456-457, 480 N.E.2d 630. The trial judge also failed
to instruct the jury that they should consider "the totality of the
circumstances" in determining whether the statement was voluntary.
See Rodriguez, 425 Mass. at 369, 682 N.E.2d 591; Commonwealth v.
Blanchette, 409 Mass. 99, 108 n.4, 564 N.E.2d 992 (1991).

Trial counsel offered no explanation for his failure to object
to this flawed instruction.[5]  Indeed, he admitted that he did not
remember the instruction or his reaction to it.  MNT Tr. 5:449.
Clearly then, his failure to object to the instruction was not a
reasonable "strategic choice." Strickland, 466 U.S. at 690, 104 S.

---

[5] Trial counsel had prepared proposed jury instructions on
the issue of "Voluntariness of Statements" which appeared to
state the law properly.  S.A. 2:G-373.

39

Ct. 2052.

For the same reasons that Mr. Boateng argued in Argument II(B)(2) _supra_ that trial counsel should have moved to suppress his statements, he submits that counsel should have objected to the instruction at issue here. Had counsel demanded that the jury be instructed that they had to determine that the statements to Ms. Hall, Ms. Moore and the police were voluntary beyond a reasonable doubt before considering them, he would have increased the chances that the jury would not have considered the statements. Because this obviously would have been beneficial to the defense and there was no downside, counsel's failure to demand a more favorable instruction was deficient performance. _Strickland_, 466 U.S. at 687, 104 S. Ct. 2052.

As for prejudice, because the judge never informed the jury that the Commonwealth had to prove the voluntariness of the statements beyond a reasonable doubt, there is a reasonable probability that the jury determined that the statements were voluntary based on a lesser standard of proof and then used the statements to reach a conclusion that the Commonwealth had proven Mr. Boateng's sanity beyond a reasonable doubt. Conversely, had the jury been properly instructed, there is a reasonable probability that they would have concluded that the Commonwealth had not proven the voluntariness of the statements beyond a reasonable doubt, especially given Mr. Boateng's undisputed major mental illness. Moreover, the chances that the jury would have

refused to consider the statements would have improved further still had defense counsel presented at trial the testimony of Dr. Spiers and Dr. Brown that Mr. Boateng's statements to the police were not voluntary.

In response to this claim, this Court stated "the decision not to object to the jury instructions can be considered reasonable strategy, as the statements could be deemed to be consistent with petitioner's insanity defense." Op. at 9-10. Respectfully, this claim makes little sense. The humane practice instruction was designed to restrict consideration of Mr. Boateng's statements. If counsel wanted the jury to consider them, he should have objected to the giving of any such instruction. He did not do this. To the contrary, he submitted to the judge a proper humane practice instruction. See note 5 <u>supra</u>. In any event, as explained in Section II(B)(1) and (2) of his original memorandum of law, Mr. Boateng argued that his statements were in fact harmful to an insanity defense and thus the failure to challenge them or demand a proper instruction concerning the jury's consideration of those statements was ineffective assistance. As Mr. Boateng noted in Section II(B)(2) above, this Court never addressed Mr. Boateng's arguments on these points.

Once again, this Court's rejection of his ineffective assistance claim is unreasonable. In any event, Mr. Boateng has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to the effective assistance of

41

counsel.  At the very least, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason."    <u>Miller El</u>, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue.  <u>See</u> <u>id.</u> at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

    **F.    Trial Counsel Failed to Request a Contemporaneous Competency Hearing**

    Finally, Mr. Boateng argued that his trial counsel provided ineffective assistance because he failed to request a competency hearing at the beginning of trial or at any point during trial.

    The trial, conviction or sentencing of a person charged with a criminal offense "while he is legally incompetent violates his constitutional rights of due process" under the Fourteenth Amendment to the United States Constitution.  <u>See</u> <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S. Ct. 896 (1975).

    Under Massachusetts law, the court is required to hold an evidentiary hearing on the defendant's competency to stand trial when there is a "substantial question of possible doubt" about the defendant's competence.  <u>See</u> <u>Commonwealth v. Hill</u>, 375 Mass. 50, 62, 375 N.E.2d 1168 (1978).  Even where there has been an earlier finding of competence, as there was here, counsel should insist on further inquiry if subsequent events raise doubts about competency. <u>See</u> <u>Hill</u>, 375 Mass. at 54, 375 N.E.2d 1168; <u>Commonwealth v. Vailes</u>,

360 Mass. 522, 524, 275 N.E.2d 893 (1971).

There is no question that at the time of trial Mr. Boateng suffered from a severe and debilitating mental illness - and that he had suffered from this illness since at least 1988. Tr. 8:21-63; S.A. 3:H 399-650. As the trial date approached, trial counsel's concerns regarding Mr. Boateng's competency prompted him to request a hearing to determine whether Mr. Boateng was competent to stand trial. He filed a motion approximately two weeks prior to trial, setting forth six significant factors questioning Mr. Boateng's competency. S.A. 2:F-24.

At the conclusion of the hearing, he explained his concern about Mr. Boateng's mental health, stating "I had initially told the court that Mr. Boateng's appearance and his communication with me had changed dramatically in the past three weeks". CTr. 36. Nevertheless, he did not object to the Court's finding that Mr. Boateng was competent to stand trial. One week later, on the first day of trial, he waived any further inquiry into his client's competency to stand trial. Tr. 1:24-25. As the result of such waiver, the court made no further competency inquiry during the remainder of the trial.

This Court rejected Mr. Boateng's ineffective assistance claim because the trial court had conducted a competency hearing five days before trial and "nothing in the record indicates that there was a change in petitioner's mental state during those five days". Op. at 10.

Notwithstanding the February 24th finding that Mr. Boateng was competent to stand trial (CTr. 46), Mr. Boateng submits that the evidence of his long history of treatment for psychiatric problems and irrational behavior as shown by his extensive mental health records (S.A. 3:H, 399-651), the testimony of Dr. Marcus Goldman at the February 24th pre-trial hearing as to the nature of his prescribed medications, (CTr. 8-22), and Dr. Rosemarin's testimony that Mr. Boateng was delusional and paranoid during his contacts with his defense attorneys as well as with him (Tr. 8:82-84), created a "substantial doubt" as to his competence to stand trial in early March, 1994. See Hill, 375 Mass. at 54, 375 N.E.2d. 1168. At the very least, Mr. Boateng submits that he has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to the effective assistance of counsel or that "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

**III. THE TRIAL JUDGE VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS WHEN HE FAILED TO CONDUCT A CONTEMPORANEOUS COMPETENCY HEARING**

Mr. Boateng alleged that the trial judge violated his federal constitutional right to due process of law because he failed to hold a competency hearing on the first day of trial or at any point during trial despite sufficient doubt about his competency.

The Supreme Court has long held that the trial, conviction or sentencing of a person charged with a criminal offense "while he is legally incompetent violates his constitutional rights of due process" under the Fourteenth Amendment to the United States Constitution. See Drope, 420 U.S. at 171, 95 S. Ct. 896. The test for legal competence is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." Id. at 172, 95 S. Ct. 896.

"Due process requires a court to hold a competency hearing sua sponte whenever evidence raises a sufficient doubt as to the competence of the accused." Johnson v. Norton, 249 F.3d 20, 26-27 (1st Cir. 2001), citing Drope, 420 U.S. at 180, 95 S. Ct. 896 and Pate, 383 U.S. at 385, 86 S.Ct. 836.

Pursuant to a defense motion (S.A. 2:F-24), the trial judge held a competency hearing on February 24, 1994 - one week before trial. Dr. Robert Simmons, a forensic psychologist testified. He opined that Mr. Boateng was competent to stand trial. CTr. 34-35. The Court adopted this opinion but made no findings to support such determination.

45

Immediately prior to trial on March 1, 1994, trial counsel advised the court that he was waiving his motion for competency hearing because it was "moot". Tr. 1:24. The judge responded, "I am satisfied, unless someone tells me that there has been a change of circumstances". Tr. 1:24-25. Trial counsel responded "I am unaware of any since last week". Tr. 1:25.

This Court rejected Mr. Boateng's claim because the trial court had conducted a competency hearing five days before trial and trial counsel waived his motion for a competency hearing on the first day of trial. Op. at 11. This Court ignored all of the evidence marshaled by Mr. Boateng in his memorandum of law that was developed after defense counsel waived his motion for a competency hearing.

Specifically, during the trial, defense counsel called Dr. David Rosmarin in support of a defense that Mr. Boateng lacked criminal responsibility for the death of his son. During his testimony, Dr. Rosmarin recounted in detail Mr. Boateng's long history of mental illness as reflected in mental health records dating back to 1988. The defense also called Christopher Cimmino, a clinical social worker at the Worcester County Jail. Tr. 9:38. Mr. Cimmino reported that when he was assigned to Mr. Boateng's case in January 1993, Mr. Boateng was on suicide watch. Tr. 9:44. During their treatment sessions, Mr. Boateng appeared alternately depressed, paranoid, very emotional, very agitated, and suicidal. Tr. 9:50. He also reported auditory hallucinations. Id. Finally,

46

defense counsel represented to the court that at some point Mr. Cimmino had placed Mr. Boateng on suicide watch.  Tr. 9:47.

Furthermore, as a matter of state law, post-conviction medical records are also relevant to a determination of competence at trial.  See Hill, 375 Mass. at 59, 375 N.E.2d 1168.  In connection with his new trial motion, Mr. Boateng offered post-conviction Bridgewater State Hospital records by way of a Motion to Supplement the Record.  S.A. 3:H-387.  These records demonstrated that almost immediately after his conviction, prison officials determined that Mr. Boateng was not fit to serve his sentence in a prison environment and transferred him to the state psychiatric hospital, where he remained for twenty months.  P.S.A. 2:N-1.[6]

Putting    aside    the    quantum    of    evidence    supporting    a

---

[6]  In a transfer note accompanying Mr. Boateng to Bridgewater State Hospital on May 19, 1994, Dr. Harrison O'Connor wrote:

> Mr. Boateng presents continuing signs and symptoms of major mental illness (Schizoaffective Disorder) characterized by a substantial disorder of thought, mood, and perception grossly impairing his judgement, behavior and capacity to recognize reality and his ability to continue to serve time in a prison setting.  The continuing, almost constant command hallucinations to "harm self" present a serious potential for suicidal behavior.

P.S.A. 2:N-4.  Furthermore, in December of 1994, Mr. Boateng told a clinical social worker that while he was awaiting trial at the House of Corrections, he felt "everything was very severe.  I just wanted to get it done - everything would be over.  I wasn't willing to go to trial."  Mr. Boateng indicated that he felt at that time the stress of a trial would have been too much to manage.  P.S.A. 2:N-15.

contemporaneous competency hearing, both the trial judge and this
Court clearly relied on defense counsel's representation that there
had been no change in Mr. Boateng's circumstances in the week since
his competency ruling to support his determination that there was
no need for further inquiry on this issue on the first day of
trial.  This was also error.  In <u>Odle v. Woodford</u>, a federal habeas
case, the defendant challenged his competence at trial.  238 F.3d
at 1087.  The state responded that Odle's lawyer did not question
his comeptence at the time of trial.  <u>Id.</u> at 1088.  In response the
Ninth Circuit wrote,

> It is true that "defense counsel will often have the
> best-informed view of the defendant's ability to
> participate in his defense." <u>Medina [v. California]</u>, 505
> U.S. [437,] 450, 112 S.Ct. 2572 [(1992)]. But counsel is
> not a trained mental health professional, and his failure
> to raise petitioner's competence does not establish that
> petitioner was competent.  Nor, of course, does it mean
> that petitioner waived his right to a competency hearing.

<u>Id.</u>  In short, trial counsel's opinion of the defendant's
competence is not determinative of the issue and does not absolve
the court from its responsibility to insure that the defendant is
competent to stand trial.  <u>See</u> <u>Pate</u>, 383 U.S. at 385, 86 S. Ct.
836; <u>Miles v. Stainer</u>, 108 F.3rd at 1112.

In sum, the totality of relevant information presents a
sufficient doubt about Mr. Boateng's competence to stand trial to
warrant further inquiry.  Therefore, this Court's rejection of the
claim was unreasonable.  At the very least, Mr. Boateng submits
that he has made a "substantial showing", 28 U.S.C. § 2253(c)(2),

48

that he was deprived of his constitutional right to due process of law or that "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." <u>Miller El</u>, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. <u>See</u> <u>id.</u> at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

**IV.  THE SUPREME JUDICIAL COURT DENIED THE DEFENDANT THE EQUAL PROTECTION AND DUE PROCESS OF LAW BY FAILING TO GRANT RELIEF FOR THE TRIAL JUDGE'S FAILURE TO HOLD A SUA SPONTE HEARING REGARDING THE VOLUNTARINESS OF THE DEFENDANT'S STATEMENTS TO MS. HALL, MS. MOORE AND THE POLICE**

Mr. Boateng's final claim was that the SJC violated his federal constitutional rights to equal protection and due process of law when it failed to follow its own clearly established precedent and hold a hearing <u>sua sponte</u> on the voluntariness of Mr. Boateng's statements to Ms. Hall, Ms. Moore, and the police.

In this case, the SJC conceded that as a matter of state law, "a defense of insanity, by raising questions about the defendant's state of mind, always makes voluntariness [of a statement] an issue in the case." <u>Boateng</u>, 438 Mass. at 504. Furthermore, the SJC acknowledged in this case that this rule "covers statements made by defendants to private parties" as well as the police. <u>Boateng</u>, 438 Mass. at 504.

In fact, the SJC agreed that the judge's failure to make such an inquiry in this case was error, but then held that relief was

not warranted because the error did not give rise to a substantial risk of a miscarriage of justice, despite the fact that the error led to the admission of the statements. See Boateng, 438 Mass. at 505-06.  Mr. Boateng asserted that it was improper for the SJC to apply the "substantial risk of a miscarriage of justice" standard in this context, which it normally applies only to unpreserved errors, given that the judge had a sua sponte obligation to hold a voluntariness hearing as a matter of state law. See Commonwealth v. Crawford, 429 Mass. 60, 65, 706 N.E.2d 289 (1999).  In any event, Mr. Boateng argued that because the trial judge's failure to hold a voluntariness hearing led to the admission of the statements, the resulting prejudice warranted relief.  Compare Commonwealth v. Harris, 371 Mass. 462, 470-72, 358 N.E.2d 982 (1976) (reversing 1st degree murder conviction because admission of confession without preliminary sua sponte voluntariness determination created substantial risk of miscarriage of justice).

Ordinarily a federal court may not issue a writ based on a perceived error of state law.  There is an exception to this general rule, however, "if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law."  Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871 (1984). See also Barclay v. Florida, 463 U.S. 939, 957-58, 103 S.Ct. 3418 (1983) (plurality opinion) ("[M]ere errors of state law are not the concern of this Court unless they rise for some other reason to the level of a denial of rights protected by

the United States Constitution.") (citation omitted).

In short, for all of the reasons provided above that the admission of Mr. Boateng's statements to Ms. Hall, Ms. Moore and the police was "prejudicial" for purposes of a <u>Strickland</u> ineffective assistance analysis, the trial judge's failure to hold a voluntariness hearing concerning the admissibility of the statements and the resulting admission of the statements constituted an error of state law "sufficiently egregious to amount to a denial of equal protection or of due process of law." For this reason, the SJC's failure to grant relief for violation of its own rule that a judge has an obligation to hold a voluntariness hearing where mental illness is an issue warrants habeas relief.

In addressing this claim, this Court first asserted that "the SJC concluded that the rule applies to statements made to law enforcement and not to private parties." Op. at 12. This assertion is wrong. In fact, the SJC stated only that the rule does not apply to statements made to private parties <u>during the crime</u>. See <u>Boateng</u>, 438 Mass. at 504. The SJC acknowledged that the rule does apply to statements made to private parties after the crime. See <u>id.</u> ("the rule covers statements made by defendants to private parties in the aftermath of their criminal conduct"). As Mr. Boateng noted in his original memorandum of law, Ms. Moore clearly indicated that the statements at issue – Mr. Boateng's statement to Ms. Hall that Ms. Moore was downstairs doing laundry and his statement made in the presence of Ms. Moore that he was not

going to jail - were both made after the assault was over.  Tr.
5:84, 87.

With regard to Mr. Boateng's statements to the police, this
Court essentially adopted the SJC's view that even though the trial
judge erred in failing to hold a voluntariness hearing, the error
was harmless.   Op. at 12.   The SJC gave the following
justifications for this view:

> First, the testimony of the police as to their
> observations of Boateng's calm demeanor and actions after
> the assaults would have been admissible and probative on
> the question of sanity even if the specific statements
> made to them by Boateng had been excluded.   Second,
> Boateng's calm demeanor and lucid conversation suggest
> that any hearing on the issue of voluntariness would
> likely have resulted in the conclusion that Boateng's
> statements to the police were voluntary.   Third, the
> statements, although in part corroborative of sanity,
> were not central to the case, which turned largely on
> Moore's description of Boateng's attacks and the
> testimony of the experts regarding Boateng's mental
> illness.   Finally, the judge, pursuant to our "humane
> practice," instructed the jury that they were to
> independently determine whether Boateng's statements were
> voluntary before considering them as evidence of guilt,
> thus mitigating any possible harm resulting from the
> judge's failure to hold a voluntariness hearing.

Boateng, 438 Mass. at 505-06 (citations omitted).

In his original memorandum of law, Mr. Boateng addressed all
of the reasons the SJC offered in support of its conclusion that
the error was harmless:

> Both the first and second justifications offered by
> the SJC rely on Mr. Boateng's purported "calmness" during
> his interrogation by the police.  Mr. Boateng has already
> addressed this issue above.  In short, both of his
> medical experts testified that his flat affect was likely
> indicative of mental illness and psychotic behavior
> rather than lucidity.

The SJC's third justification is in fact a
concession. The SJC acknowledges that the statements
were "corroborative of sanity". Nevertheless, the SJC
dismisses the significance of this evidence because it
"was not central to the case, which turned largely on
Moore's description of Boateng's attacks and the
testimony of the experts regarding Boateng's mental
illness." While it is true that trial counsel attacked
Ms. Moore's description of the attacks, he never disputed
that Mr. Boateng had committed the criminal acts in
question. Rather, as the SJC goes on to concede, the
"central" issue was the expert testimony and evidence
about Mr. Boateng's mental illness. This fact is helpful
to Mr. Boateng, not harmful, as the SJC seems to imply.
Given that the central issue was Mr. Boateng's mental
state, the fact that the statements were - in the SJC's
words - "corroborative of sanity" made them highly
relevant to that central issue. See Sheriff, 425 Mass.
at 192-95, 680 N.E.2d 75 (judge's failure to conduct voir
dire on voluntariness of defendant's statements in first
degree murder case was reversible error because
voluntariness of statements was live issue, defendant
raised criminal responsibility defense and statements
undermined that defense); Hunter, 416 Mass. at 835, 626
N.E.2d 873 (same).

The SJC's final justification - that the judge
instructed the jury to consider the voluntariness of the
statements - is simply irrelevant to what the trial judge
would have done had trial counsel challenged the
voluntariness of the statements. Moreover, as Mr.
Boateng explains in greater detail below in Argument
II(E), the trial judge's jury instruction on this issue
was seriously flawed because he did not instruct the jury
that they had to determine that it was clear beyond a
reasonable doubt that the statements was voluntary before
considering them. Therefore, the possibility that the
jury may have considered the statements does not
establish that the jury should have considered them -
much less that the trial judge should have permitted the
jury to consider them.

Mem. at 86-88. This Court offered no response to these arguments.

Given this Court's failure to address the substance of Mr.

Boateng's arguments, Mr. Boateng respectfully submits that this

Court's rejection of this claim was unreasonable. At the very

least, Mr. Boateng has made a "substantial showing", 28 U.S.C. § 2253(c)(2), that he was deprived of his constitutional right to equal protection and due process of law because "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason." Miller El, 537 U.S. at 337. Therefore, he is entitled to a COA on this issue. See id. at 338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

## Conclusion

For all of the forgoing reasons, Mr. Boateng respectfully requests that this Court grant his application for a Certificate of Appealability on all issues he raised in his Petition for Habeas Corpus.

Dated:                          Respectfully Submitted,

                                /s/ Chauncey B. Wood
                                Chauncey B. Wood, BBO# 600354
                                Shea, LaRocque & Wood, LLP
                                47 3rd Street, Suite 201
                                Cambridge, MA 02141
                                Tel. (617) 577-8722

<u>Certificate of Service</u>

    I hereby certify that this document, which was filed manually on this date, will be sent by first class mail, postage prepaid, on this date to David Huang, counsel for the Respondent in this matter, Michael Thompson.


Date: October 19, 2007          <u>/s/ Chauncey B. Wood</u>
                                Chauncey B. Wood